## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

**UNION INSURANCE COMPANY,**
**as Successor in Interest to**
**Great River Insurance Company**                                                    **PLAINTIFF**

**V.**                                                    **CIVIL ACTION NO.:  3:09-CV-283-HTW-LRA**

**THE TRAVELERS INDEMNITY COMPANY**
**OF CONNECTICUT,**
**FIDELITY AND GUARANTY INSURANCE**
**UNDERWRITERS, INC., AND**
**UNITED STATES FIDELITY AND GUARANTY COMPANY,**                                    **DEFENDANTS**

---

### THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT,
### FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC.,
### AND UNITED STATES FIDELITY AND GUARANTY COMPANY'S
### MEMORANDUM OF AUTHORITIES IN SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT

---

The Travelers Indemnity Company of Connecticut ("Travelers Indemnity Company"),

Fidelity and Guaranty Insurance Underwriters, Inc., and United States Fidelity and Guaranty

Company ("USFG")(collectively "Travelers"), pursuant to Fed. R. Civ. P. 56 and Uniform Local

Rule 7(b), submit this Memorandum of Authorities in Support of their Motion for Summary

Judgment.

### I.      INTRODUCTION

This action was commenced by Plaintiff, Union Insurance Company, as Successor in

Interest to Great River Insurance Company ("Union") seeking to collect $291,450 in spite of

well-established principles of insurance law which state that insureds (or, in this case, other

insurers) cannot, other than at their own expense, settle a case which is being properly defended

612807

by its insurer without that insurer's consent.  Rather, if an insurer is asked to contribute to or pay a settlement, it is the insurer's right to determine whether, and for how much, to settle the matter it is defending.  This principal of insurance law makes sense, since it is the insurer, not the insured, that bears the cost of defense and settlement.[1]  In the instant case, the insured and the other insurers took that right away from Travelers when they settled an underlying case for nearly double what Travelers had consented to and authorized.  While the insured and other insurers were free to settle the underlying case with their own money, they may not do what they seek to do in this action -- compel Travelers to pay a settlement that was not authorized or consented to by Travelers when Travelers was fully and completely discharging its duties to the insured.  Travelers also seeks summary judgment in this matter on the separate coverage ground that the maximum limit of indemnity for the insured in the underlying matter is $1,000,000.  Because the maximum indemnity available to the insured from all carriers is $1,000,000 and Travelers has paid its pro-rata share of that amount, Union's action against Travelers must fail and summary judgment is appropriate.

## II.    FACTS

On August 16, 2004 Clifford Gatlin filed a lawsuit in Hinds County Circuit Court, ("Gatlin Action"), against a number of defendants, including Custom Aggregate and Grinding ("Custom").[2]  Gatlin, who worked as a sandblaster and foundry worker, alleged that he contracted silicosis as a result of his exposure to inhaling silica dust from sand his employers purchased from numerous suppliers, including Custom.  Ex. A.  Travelers received notice of the

[1] Generally, the insured and other insurers are protected from unreasonable refusals not to settle by virtue of laws that make the insurer responsible for excess verdicts occasioned by unreasonable refusals to settle. 14 Couch on Ins. § 206:5

[2] *See* Exhibit "A," Plaintiff's Original Complaint filed in the Gatlin Action.  In addition to Custom, Gatlin sued Ash Grove Cement Company, Green Brothers Gravel Company, Kelco Sales & Engineering Company, the Vallen Corporation, and Precision Packaging, Inc.

Gatlin Action in August 2004 and, after reviewing the allegations in the complaint, agreed to
participate in the defense of the Gatlin Action, subject to a complete reservation of rights.[3]
Travelers agreed to defend Custom under the following policies: a) policies of insurance issued
by USFG from 1995 to 1997; and, b) policies of insurance issued by The Travelers Indemnity
Company from 1999 to 2001. *See* Exhibit "B," Policy No. 1CG1454902800 by Fidelity and
Guaranty Insurance Underwriters, Inc., with a policy period of March 20, 1995 to March 20,
1996; Exhibit "C," Policy No. 1CG14548757300 by United States Fidelity and Guaranty
Company with a policy period of March 20, 1996 to March 20, 1997; Exhibit "D," Policy Nos.
Y-630-935K5181-TCT-99, Y-630-935K5181-TCT-00, and Y-630-935K5181-TCT-01 issued by
The Travelers Indemnity Company.  The policy periods for the policies attached as exhibit "D"
began on March 31, 1999, and ended on June 8, 2001, when Y-630-935K5181-TCT-01 was
canceled by endorsement.

Other carriers, including Union's predecessor in interest, Great River Insurance
Company,[4]  Zurich and Kemper (collectively the "Insurers") also insured Custom during the time
period alleged in the Gatlin Action and agreed to provide a defense to Custom in the lawsuit.[5]
The defense of the Gatlin Action was assigned to the law firm of Forman, Perry, Watkins, Krutz,
& Tardy ("Foreman Perry") who had traditionally handled the defense of Mississippi silica
lawsuits against Custom.[6]  At the time that they assumed the defense of Custom, the Insurers had
previously agreed informally to apportion defense costs according to a rough allocation based

---

[3] Gatlin contended that he was exposed to silica dust from Custom's product from 1988 to 2003.  Travelers insured Custom from 1995 to 1997 and from 1999 to 2001.  Ex. B; Ex. C; Ex. D.  Union insured Custom from 1997 to 1999. Ex. E; Ex. F.
[4] Union insured Custom from 1997 to 1999.  *See* Exhibit "E," Policy No. SP1 1008870-10, with a policy period of March 31, 1997 and March 31, 1998; *see also* Exhibit "F," Policy No. SP1 1008870-11, with a policy period of March 31, 1998 and March 31, 1999.
[5]  The other two insurers who participated in the defense of Custom in the Gatlin action were Zurich American Insurance Company and Kemper Insurance Company.  Ex. "G" Affidavit of Claudette Savwoir.   Kemper insured Custom from 1993 to 1995.  Zurich insured Custom from June of 2001 to November 30, 2001.  Ex. G.
[6] Travelers was not the Insurer who initially retained Foreman Perry.

upon each insurer's time on the risk.  Ex. G.  Based upon this allocation, the insurers agreed to pay the following percentages of defense costs:  Travelers, 48.57%; Union, 22.86%; Kemper, 22.86%; and, Zurich, 5.71%.  Ex. G.

From August 2004 until July 2007 the Gatlin Action was essentially inactive.  Ex. G. However, on July 13, 2007, Travelers and the other Insurers were informed that the Hinds County Circuit Court had set the Gatlin Action for trial beginning October 15, 2007, with a discovery deadline of August 15, 2007.  Ex. G.   At that time, only two defendants remained in the case, Custom and Precision Packaging, Inc. ("Precision").[7]   Ex. G.   Because of the compressed schedule, various depositions, including the depositions of Clifton Gatlin (the underlying plaintiff), Gatlin's employer, Custom's corporate representative, and Gatlin's multiple experts took place on an expedited schedule in late July and August 2007, while other significant trial preparation was occurring.  Ex. G.

On September 20, Gatlin sent a settlement demand to Custom for $25,000,000.  Ex. G. On September 27, 2007, Custom and Precision participated in a mediation of the Gatlin matter. Ex. G.  When the mediation ended, Gatlin had rejected Custom's $800,000 offer, as well as its closing "soft offer" to go to $1,000,000 if Gatlin would accept that amount.  Ex. G.   Gatlin had countered with $4,000,000. Ex. G.  Also at the close of mediation, Precision settled its claims with Gatlin, so Custom was the only remaining defendant in the Gatlin Action.  Ex. G.

During the time that Travelers' representatives were in Jackson for the Gatlin mediation, the Insurers, and specifically Travelers, discussed with defense counsel several legal arguments and defenses Travelers believed needed to be pursued which had not been previously fully developed.  Ex. G.  Specifically, Travelers discussed with defense counsel:  (1) requesting a credit for the settlement amounts Gatlin received in a similar action he filed in Texas against

---

[7] There were initially five defendants in the Gatlin Action. Forman Perry represented both Custom and Precision.

over 60 defendants; (2) the recently filed summary judgment motion seeking dismissal of Gatlin's Action based on the fact that Gatlin had split his cause of action between this case and his previous Texas litigation; (3) emphasizing the difference in Custom's place in the market and relatively less culpability than its former silica co-defendant, Precision, when negotiating and discussing the case with Gatlin; (4) quantifying the possibility of apportionment of any judgment amongst joint tortfeasors, particularly those named in Gatlin's Texas action; and (5) exploring the issues and implications of Gatlin's significantly inconsistent deposition testimony on key liability points.  Ex. G.

Due to the extraordinarily high settlement demand to Custom from Gatlin, the very tight discovery schedule and trial setting, and the numerous undeveloped legal arguments, Travelers became concerned that the settlement valuation of Gatlin's claims was excessive.  Ex. G.   On October 1, 2007, following the unsuccessful mediation and with the concerns outlined above in mind, Travelers advised Custom it did not believe that a settlement valuation of Gatlin's claims above $1,000,000 was reasonable.  Ex. G.

On October 2, following a request by Travelers, defense counsel formally extended the $1,000,000 offer to settle Gatlin's claims on behalf of Custom.  Ex. G.  Gatlin rejected the offer and countered with $3,800,000.  Ex. G.  Over the next several days, the Insurers and Custom discussed internally the valuation of the case and Travelers' position that the total amount available for settlement was $1,000,000.  Ex. G.  Travelers repeatedly advised the Insurers and Custom that the most it would pay towards settlement was $485,700, or 48.57% of $1,000,000, but that it remained committed in its defense obligations to Custom.  Ex. G.  The Insurers and Custom expressed their disagreement with Travelers' position regarding the settlement amount and, following further discussions on October 5, 2010, neither the Insurers nor Custom had any

further contact with Travelers regarding settlement negotiations or the merits of the Gatlin Action.  Ex. G.

On October 8, 2007, Travelers was copied on an email advising that Gatlin sent a new settlement demand for $2,700,000.  Ex. G.  Union, Zurich, and Kemper conferred and decided, without consultation with Travelers and with the knowledge that Travelers would pay no more than $485,700, that those three Insurers would respond with a settlement offer of $1,400,000.  Ex. G.  Negotiations apparently continued throughout the day on October 9, 2007, with defense counsel coordinating with Union's representative regarding counter-offers to Gatlin.  Ex. G.  Travelers was not included in those discussions nor did it consent to the decisions being made by the Insurers and Custom.  Ex. G.  Ultimately, Travelers was advised by email late in the afternoon of October 9, 2007, that the case had settled for $1,750,000.  Ex. G.  Travelers was not consulted and did not consent to the settlement amount.  Ex. G.  The Insurers paid the following amounts of the $1,750,000 settlement:   Travelers, $485,700; Union, $691,500; Kemper, $400,050; and Zurich, $172,750.   Union has now filed this suit seeking the recovery of $291,450, an amount it unilaterally agreed to pay, with the consent of the other Insurers and Custom, but without Travelers' consent or approval.   For the reasons set forth below, Travelers is entitled to summary judgment dismissing Union's claims against it.

### III.   LAW AND ARGUMENT

#### A.   STANDARD OF REVIEW.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "material" fact is one that might be outcome-determinative, and a "genuine" issue exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.     THE INSURED'S BREACH OF THE INSURANCE CONTRACT PRECLUDES UNION'S ACTION.**

Custom authorized the settlement of the Gatlin Action without the consent of Travelers. By settling the Gatlin Action without Travelers' approval or consent, Custom breached its insurance contracts with Travelers in at least three ways.  First, Custom deprived Travelers of its contractual right to defend the Gatlin Action.  Each of Travelers' insurance policies with Custom provides the following language:  "We will have the right and duty to defend any 'suit'…" Second, each of the policies also provide that Custom will "cooperate with [Travelers] in the investigation, settlement or defense of the claim or suit."  Custom breached the cooperation clause of the policies by settling the case without Travelers consent.  Numerous courts have held that because the provisions of an insurance policy grant the insurer the right to defend suits and require the insured to cooperate with the insurer, the [insured] cannot make any agreement which would operate to impose liability upon his insurer or would deprive the insurer of the use of a valid defense.  *Ideal Mut. Ins. Co. v. Myers*, 789 F.2d 1189, 1202 (5th Cir. 1986).   At all times, Travelers was fully discharging its duty to defend Custom in the Gatlin Action.  By settling the Gatlin Action without Travelers' consent, Custom breached the "right to defend" and "cooperation" provisions of the insurance contracts.

The policies also provide standard "consent-to-settle" clauses that provide that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."    By settling the Gatlin Action, Custom breached its insurance contracts with Travelers since the policies explicitly provided Travelers the right to consent to any settlement.  *See St. Paul Prop. & Liab. Ins. Co. v. Nance*,

577 So. 2d 1238, 1242 (Miss. 1991)(stating that settlement by an insured without consent by the insurer gives rise to a breach of contract claim on the part of the insurer).  Since Custom breached its insurance contracts with Travelers and Travelers fully discharged its duties of defense to Custom, Custom is unable to sue Travelers for the difference between the amount Travelers authorized for settlement and the actual settlement amount for the Gatlin Action.  *See Motiva Enter., LLC v. St. Paul Fire and Marine Ins. Co.*, 445 F.3d 381, 386-87 (5th Cir. 2006); *Danrick Constr. Inc. v. Am. Cas. Co. of Reading Pennsylvania*, 314 Fed. Appx. 720, 724 (5th Cir. 2009).  Since Union is not entitled to any greater rights under the policies than Custom, and Custom has no right of action against Travelers for the overpayment due to its breach, the present action by Union is precluded. *See Pac. Indem. Co. v. Acel Delivery Serv., Inc.*, 485 F.2d 1169, 1177 (5th Cir. 1973) (holding that generally, the right of any injured party to proceed against the insurer under the policy depends upon the insured's right of action against the insurer, the claimant has no greater rights than the insured).

**C.     UNION'S CLAIMS ARE BARRED BY THE VOLUNTARY PAYMENT DOCTRINE.**

The volunteer doctrine is a common-law construct that has been consistently followed in Mississippi, often as a bar to actions between parties seeking contribution.  *Genesis Ins. Co. v. Wausau Ins. Companies*, 343 F.3d 733, 736 (5th Cir. 2003).   The rule establishes that:

> "[A] voluntary payment cannot be recovered back and a voluntary payment within the meaning of this rule is a payment made without compulsion, fraud, mistake of fact, or agreement to repay a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand."

*Genesis*, 343 F.3d at 736 (citing *McDaniel Bros. Constr. Co., Inc. v. Burk-Hallman Co.,* 175 So. 2d 603, 605 (Miss. 1965); *Presley v. Am. Guar. & Liab. Ins. Co.,* 116 So. 2d 410, 416 (Miss.

1959); *McLean v. Love,* 157 So. 361, 362 (Miss. 1934)).  In contrast, an involuntary payment is one "not proceeding from choice."  *Genesis,* 343 F.3d at 738.

Union claims that it paid more than it owed to settle the Gatlin Action.  However, Union admits it did not owe the money.  Further, Union made the payment without compulsion, fraud, mistake of fact, or an agreement that the excess amount would be re-paid or the coverage dispute litigated after settlement.  For these reasons, and as more fully discussed below, Union's claims are barred by the voluntary payment doctrine.

### 1.    Union's payment was not made under compulsion.

Because Travelers was fully discharging its contractual duties to Custom in the Gatlin Action, Union's alleged overpayment was voluntary and not compelled.  Additionally, while Union may claim that it had pressure to settle the Gatlin Action due to an upcoming trial date, not all pressure for payment, including an impending trial date, amounts to compulsion.  *Genesis,* 343 F.3d at 739 citing (*Glantz Contracting Co. v. Gen. Elec. Co.,* 379 So. 2d 912, 917-18 (Miss. 1980)) and 16 Lee R. Russ, Couch on Insurance § 223.28 (3d. ed. 2003).  Additionally, a payment is considered coerced or compelled only where it is made to avoid the loss of a necessity, or to prevent an injury to a person, business or property which is different and disproportionately greater than the unlawful demand.  *Genesis,* 343 F.3d at 740.  As discussed below, Union's payment in the Gatlin Action meets none of these criteria.

In *Genesis,* the Fifth Circuit dealt with a factual scenario similar to the facts at issue in this matter, where one insurer, Genesis, sued another insurer, Wausau, for $200,000, the amount Genesis contributed to the settlement of the underlying matter.  *Genesis,* 343 F.3d at 735.  Genesis claimed that the settlement payment was made under compulsion since Wausau did not advise Genesis of its intention to deny coverage.  *Genesis,* 343 F.3d at 738.  Genesis claimed that

because of the late notice from Wausau that Wausau planned to deny coverage, Genesis was deprived of the ability to mount an adequate defense and was forced to settle. *Id.* However, the Fifth Circuit disagreed with Genesis and instead affirmed the district court in finding that a lack of "timely notice" does not compel settlement or bar the voluntary payment doctrine. *Id.* Ultimately, the Fifth Circuit found that Genesis' decision between settling or taking the case to trial did not rise to the level of "compulsion" in order to avoid the voluntary payment doctrine since the decision lacked the sense of immediacy often accompanied by compelled payments and the stakes were of an insufficiently dire magnitude to justify finding that Genesis' settlement contributions were compelled. *Id.* at 739-40.

Similar to the *Genesis* case, Union was faced with the option of paying $291,450 more than it believed it should or allowing the Gatlin Action to go to trial, if the case was not continued from the trial docket.[8]  Union elected, voluntarily and in the face of Travelers clearly articulated concerns regarding the reasonableness of the settlement and the overall indemnity limit, to pay an additional amount to settle the case.  Pursuant to *Genesis*, the fact that the Gatlin Action could potentially have gone to trial in October 2007 (even though the court administrator had advised it likely would not) did not present a situation of "immediacy" such that the payment was compelled.  *Genesis,* 343 F.3d at 739.  Second, the stakes were not of a sufficiently dire magnitude to justify finding that Union's payment was compelled, when, as discussed above, there were numerous undeveloped legal arguments which the court had not yet ruled upon which could have significantly limited Gatlin's damages against Custom.  For these reasons, Union's payment towards the settlement of the Gatlin Action was not made under compulsion.

---

[8] An email from Forman Perry on October 8, states that the court administrator had advised that the Gatlin action would likely be continued and would likely not got to trial on October 15.  *See* Exhibit "H," Email from defense counsel regarding trial setting.

**2.      Union's payment was made without mistake of fact or fraud.**

Union does not and cannot contend that its settlement payment in the Gatlin Action was made as a result of mistake of fact or fraud.  Union clearly understood that the most Travelers would pay to settle the Gatlin Action was $485,700.  Ex. G.  In fact, in email correspondence between the parties, Travelers communicated its position regarding the settlement value of the case clearly and unequivocally.  Ex. G.  Union has not pled that it was mistaken or defrauded, and, as such, upon information and belief, this is not an issue in dispute, and will not preclude the application of the voluntary payment doctrine.

**3.      There was no agreement to litigate coverage disputes following the settlement.[9]**

A mutual agreement between Union and Travelers to litigate their respective liabilities among themselves after settling the Gatlin Action would preclude the application of the voluntary payment doctrine.  *Genesis,* 343 F.3d at 736.  However, it is clear from the correspondence produced in this matter that no such mutual agreement existed.  Rather, any attempts by Union to reserve these rights were unilateral at best and the caselaw is clear that a unilateral reservation of rights will not escape the application of the volunteer doctrine.  *Genesis*, 343 F.3d at 736.

As an initial matter, no such agreement could have existed based upon the timing of the settlement. The Gatlin Action settled at approximately 4:00 p.m. CT on October 9, 2007.  Ex. G. Based upon Travelers' review of the file materials, there is no correspondence from any Insurer prior to the date of settlement which states or even attempts to make an agreement with Travelers to litigate the coverage issues after the settlement is consummated.  Ex. G.  As such, there could

---

[9] An agreement by Travelers to repay the $291,450 would also void the voluntary payment doctrine.  *McLean v. Love*, 157 So. 361, 362 (Miss. 1934).  However, Travelers denies and Union does not allege that there was an agreement that Travelers would repay the alleged $291,450 overpayment by Union.

not be any "mutual agreement" to litigate coverage disputes which could have been entered into prior to the settlement.   Ex. G.   Importantly, also, Travelers advised the other carriers within a couple of hours of the settlement being announced by defense counsel that it reserved the right to raise the issue of voluntariness of the settlement payment.   Ex. G.   As such, it is clear that there could have been no mutual agreement, since Travelers' intention to raise the voluntary payment doctrine was communicated immediately after the settlement was announced.   Ex. G.   Similarly, the other Insurers could not have believed that Travelers intended to preclude itself from raising the voluntary payment doctrine since it specifically reserved its right to raise that issue.   Ex. G.

4.   **Cases holding that an insurer which refuses to honor its contractual obligations may not raise the voluntary payment doctrine are irrelevant and distinguishable.**

Union will likely attempt to rely on two irrelevant Mississippi Supreme Court cases in an attempt to avoid summary judgment.   Both of these cases stand for the unremarkable proposition that an insurer which refuses to honor its contractual obligations cannot then be heard to argue that a settlement was a voluntary payment.   Obviously, an insurer that disclaims its obligations to its insured under its contract cannot insist that the insured nevertheless abide by the conditions of the contract.   Had Travelers breached its contractual obligations to Custom, then Custom and the other insurers could settle the case without Travelers' consent, and Travelers could not raise the voluntary payment doctrine as a defense to any contribution claim.   Of course, that is not what happened in the Gatlin Action.   Rather, Travelers was defending Custom and communicated its commitment to its defense obligations, but simply disagreed, as was its right, with the settlement value of the Gatlin Action.

Both of the decisions discussed below are factually and legally distinct from the issues in this case.  However, Travelers feels that these decisions should be brought to the Court's attention in order that they may be properly distinguished.

a.    ***State Farm Mutual Automobile Insurance Co. v. Allstate Insurance Co***.:[10]

In the *State Farm* case, both Allstate and State Farm insured Ethelyn Prewitt who was involved in an automobile accident.  *State Farm*, 255 So. 2d at 668.  State Farm investigated the accident and determined that Ms. Prewitt was negligent and that the damages and injuries caused in the accident were caused by Ms. Prewitt.  *Id.*  State Farm made a demand upon Allstate to contribute to a settlement of the claims.  *Id.*  However, Allstate refused to contribute in any way to the settlement or to otherwise defend Ms. Prewitt. *Id.*  Following settlement of the case, State Farm sued Allstate for contribution of one half of the settlement amount.  *Id.*  On appeal, the Mississippi Supreme Court found that Allstate had breached its contract of insurance with Ms. Prewitt by refusing to defend, and that it should not be allowed to take advantage of its own wrong by asserting that State Farm was a volunteer for the purposes of the settlement. *Id.* at 669.

b.    ***Guidant Mutual Insurance Co. v. Indemnity Insurance Co. of North Am*erica:**[11]

In the *Guidant* case, there was a dispute between insurers Guidant and Indemnity Insurance Company of North America ("INA") as to which insurance was primary and who should defend and indemnify James Hingle, a volunteer firefighter, for an automobile accident Hingle caused with Sam and Ruby Anderson while he was en route to a fire.  *Guidant,* 13 So. 2d 1270, 1273 (Miss. 2009).  Because Hingle was a volunteer firefighter, the Andersons filed two separate lawsuits – one against Hingle, individually, and one against Marshall County, the volunteer fire department, and the Marshall County Board of Supervisors.  *Id.*  Guidant insured

---

[10] 255 So. 2d 667 (Miss. 1971).
[11] 13 So. 3d 1270 (Miss. 2009).

Hingle on his personal automobile policy and under an umbrella policy and INA had issued an automobile policy to Marshall County. *Id.* Initially, Guidant hired counsel to defend both lawsuits and later attempted to have INA contribute to a proposed settlement of both of the Anderson lawsuits, but INA declined to participate at all. *Id.* at 1274. Guidant settled both cases and sought contribution from INA. *Id.* In defense, INA raised the voluntary payment doctrine. *Id.* at 1279-80. Citing the *State Farm* decision, the Mississippi Supreme Court found that Guidant could move forward on its claim of contribution since INA had refused to honor it contractual obligations to Hingle. *Id.* at 1280.

> **c.    The facts of this matter are easily distinguishable from the *State Farm* and *Guidant* cases.**

In contrast to the actions of Allstate in the *State Farm* case, Travelers at all times completely and fully discharged its duty to defend Custom in the Gatlin Action. Additionally, Travelers made clear that it would contribute to settlement of the Gatlin Action up to $485,700, Travelers' share of $1,000,0000, but that it simply disagreed that any settlement amount over $1,000,000 was reasonable or required under the policies. As such, Travelers never breached its contract with Custom, but rather had a legitimate disagreement regarding the valuation of Gatlin's case because of the numerous undeveloped legal theories discussed above, the compressed time frame, and its concerns regarding the overall indemnity limit available. Because the *State Farm* ruling precluding the application of the voluntary payment doctrine rests upon the fact that Allstate breached its contract and should not be allowed to take advantage of its own wrong, State Farm is legally and factually distinguishable from the facts and issues in this matter since Travelers fully discharged its duties to Custom. As such, *State Farm* does not preclude the application of the voluntary payment doctrine to Union's claims.

As with the *State Farm* decision discussed above, the facts and legal issues in this matter are dramatically different from the *Guidant* case.  In *Guidant*, INA contested any obligation to defend Hingle and, even though given the opportunity, it refused to participate in any way in the settlement of the lawsuits filed by the Andersons.  By declining to participate in the settlements of the Anderson lawsuits and contesting its duty to defend, INA refused to honor its contractual obligations to Hingle.  In contrast, Travelers did not refuse to defend Custom, but rather was vigorously participating in the defense of Custom and seeking to mitigate the alleged damages against it, and was actively seeking to participate in settlement of the case.  Rather, as stated above, because of the numerous unresolved legal theories and issues and the compressed time schedule, Travelers disagreed with the settlement valuation of the Gatlin Action and did not believe settlement above $1,000,000 was reasonable.  For these reasons, *Guidant* is legally and factually distinct from the facts of this matter and does not preclude the application of the voluntary payment doctrine to Union's claims.

**D.  GATLIN'S INJURIES CONSTITUTE A SINGLE OCCURRENCE SUBJECT TO ONE POLICY LIMIT OF $1,000,000.**

As discussed above, Travelers, or its predecessors, issued 5 policies of insurance to Custom.  Each of the Travelers' policies provided commercial general liability coverage with a per occurrence limit of $1,000,000.  Additionally, each of the Travelers' policies defines "Occurrence" as "an accident, including ***continuous or repeated exposure*** to substantially the same general harmful conditions." Ex. B, C, and D. (emphasis added).[12]   Union issued two policies of insurance.  Both Union policies contain $1,000,000 per occurrence limits.  *See,* Ex. E,

---

[12]   The interpretation of an insurance policy presents questions of law, not fact. *Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyd's London*, No. 1:07cv568-LTS-RHW, 2008 WL 2699775, at *2 (S.D. Miss. July 2, 2008). When interpreting an insurance policy, courts in Mississippi follow the general rules of contract construction. *See Boteler v. State Farm Cas. Ins. Co.*, 876 So. 2d 1067, 1070 (Miss. Ct. App. 2004).

6013-USPOL-756 and Ex. F, 6013-USPOL-860.  Additionally, both Union policies contain the same definition of "Occurrence" as the Travelers' policies.  As such, Custom's insurance policies, whether issued by Travelers or Union, define "Occurrence" to include damage resulting from "continuous or repeated exposure to substantially the same general harmful conditions." Gatlin was allegedly continuously and repeatedly exposed to excessive levels of silica dust during his work as a sandblaster.  The exposure to silica produced by blasting sand was alleged to be the cause of Gatlin's silicosis.  As such, Gatlin's alleged exposure to silica dust and resulting silicosis fit squarely within the definition of an "Occurrence" under the terms of the policies.

Despite the fact that Gatlin's silicosis is a single occurrence, Union contends that the per occurrence limits of each policy accumulate, creating coverage for the entire Gatlin settlement. [Doc. No. 1 ¶ 16].  The doctrine allowing an insured to accumulate liability insurance across multiple policy periods in response to a claim which spans multiple periods is known as "sequential stacking"[13] or "horizontal stacking."[14]  It has not been adopted in Mississippi.  [Doc. No. 1, ¶4, ¶19].

In *American Physicians Insurance Exchange v. Garcia,* the Texas Supreme Court was confronted with medical malpractice alleged to have spanned several policies issued by two different insurers.  The court concluded that the alleged malpractice was a single occurrence. Despite allegedly spanning several policy periods and two insurers, the court held that the most coverage available was the highest limit of liability of any policy in place during the relevant period.  876 S.W. 2d 842 (Tex. Sup. Ct. 1994).  The court stated:

---

[13] 12 Couch on Ins. § 169:5 "Other Forms of 'Stacking' Distinguished—Stacking of Policies Covering Different Time Periods."
[14] *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1061 n. 5 (La. 1992).

> Simply because a "Claim Occurrence" extends throughout several policy periods does not raise the per-occurrence indemnity cap established in every policy. Even the jurisdiction embracing the broadest coverage trigger rule has held that multiple coverage does not permit an insured to "stack" the limits of multiple policies that do not overlap…."

*Id.* at 853-854 (footnotes omitted). The *Garcia* court noted that the policy's definition of "Claim Occurrence," was based on the common liability definition of "Occurrence." *Id* at 853 n. 21. The court in *Garcia* found that there was one occurrence under the several policies provided for the alleged malpractice. *Id.* at 855. As such, the insured was only entitled to the highest available occurrence limit divided by each of the respective carriers. *Id.*; *See also N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 556-7 (5th Cir. 2008) (citing *Garcia* and applying its anti-stacking rule).

The *Garcia* court also cited decisions from other jurisdictions which support this interpretation. *Chicago Ins. Co. v. Pacific Indem. Co.,* 566 F.Supp. 954, 956 (E.D. Pa. 1982) ("Plaintiff's contention that the coverages under Pacific's successive annual policies should be 'stacked' before [the] excess policy is called into play must be rejected.... The fact that the physician's alleged failure to make a proper diagnosis may have extended over several years does not mean that the failure gave rise to more than one claim of malpractice."). *See also Hartford Cas. Ins. Co. v. Med. Protective Co. of Fort Wayne, Indiana*, 641 N.E.2d 545, 551-2 (Ill. App. Ct. 1994) ("The insured purchased a specific amount of coverage for which they paid a specifically designated premium. For each policy period the insureds paid a premium for $200,000, $1,000,000 and $1,000,000 respectively as renewal of the coverage for two years. Defendants argue that to allow the stacking of these renewal policies would be tantamount to

allowing the policies, even after expiration, to continue in effect ad infinitum and could be analogized to a "type of cumulative savings account of indemnity".  We agree with defendant. ... [T]he parties bargained for one policy which expired at the end of one year and was subsequently renewed successively for two additional terms.  We have failed to find authority for the proposition that where there are renewal policies the coverage can be accumulated to cover one occurrence.").

Similarly, the Fifth Circuit, applying Mississippi law, has held that a continuous scheme of embezzlement by an employee was a single occurrence under a first party employee dishonesty policy.  *Madison Materials Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 523 F.3d 541 (5th Cir. 2008).

> The policy *defines occurrence as "*an act or *series of related acts* involving one
> or more 'employees.'"  Mississippi courts have recognized that an ***"occurrence"***
> ***is determined by the cause or causes of the resulting injury***.  Walker repeatedly
> committed related acts of embezzlement throughout the decade of St. Paul's and
> USF&G's coverage, but ***there was only one cause of the injury sustained by***
> ***Madison - Walker's dishonesty***. ***As there was but a single cause of Madison's***
> ***injury, and as the policy states that multiple related acts are to be treated as a***
> ***single occurrence***, ***there was only one occurrence*** of employee dishonesty over
> the ten year period.

*Id.* at 543-44 (footnotes omitted, emphasis added).  Since the employee's course of theft was a single occurrence, the insured was entitled to only the per occurrence limit for the policy in force when the theft was discovered.  *Id.* at 546.

18

The Fifth Circuit's reasoning in *Madison Materials v. St. Paul* is equally applicable to this case. Gatlin contracted silicosis as the result of his continuous and repeated exposure to substantially the same condition, silica dust. His silicosis is a single occurrence under the definition shared by <u>all</u> the applicable policies. Therefore, the Insurers are collectively responsible for a single per occurrence limit. Travelers has already tendered its proportionate share of the $1,000,000 occurrence limit, $485,700. For these reasons, Union's action against Travelers for contribution must fail.

## IV.  CONCLUSION

Union's claims in this matter are barred since Travelers fulfilled its duty of defense to Custom, and Custom breached its contractual duties to Travelers. Since Custom's breach precludes it from seeking reimbursement from Travelers, Union should not be allowed to seek reimbursement. Further, Union cannot show that its alleged overpayment was the result of compulsion, mistake of fact or fraud. Additionally, there was no agreement between Union and Travelers to reserve the coverage dispute for litigation after the settlement nor was there an agreement for Travelers to repay Union. As such, Union's payment meets all of the criteria as a voluntary payment under Mississippi law. Importantly, this matter is distinguishable from the *State Farm* and *Guidant* cases because Travelers fully and completely discharged its contractual duties to Custom. As such, the voluntary payment doctrine bars Union's claims. Finally, because Gatlin's claimed injuries fall squarely within the "Occurrence" definition of the policies, and thus, there is only one occurrence, there is only one policy limit available to indemnify Custom for the Gatlin Action. For these reasons, Travelers respectfully requests that the Court find that Union's claims are barred and grant its motion for summary judgment.

Respectfully submitted,

THE TRAVELERS INDEMNITY COMPANY OF
CONNECTICUT, FIDELITY & GUARANTY
INSURANCE UNDERWRITERS, INC. AND UNITED
STATES FIDELITY & GUARANTY COMPANY

BY:  CARROLL WARREN & PARKER, PLLC


BY: *s/Lee Ann Thigpen*
      Lee Ann Thigpen


**OF COUNSEL:**

Lee Ann Thigpen, Esq. (MB# 100229)
CARROLL WARREN & PARKER, PLLC
188 East Capitol Street
One Jackson Place, Suite 1200
Post Office Box 1005
Jackson, Mississippi 39215-1005
Telephone (601) 592-1010
Facsimile (601) 592-6060

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this day served the above pleading via the U.S. District Court

for the Southern District of Mississippi's ECF filing system to the following recipients:

> J. Stephen Wright, Esq.
> James C. Martin, Esq.
> Wright & Martin, LLP
> P.O. Box 1950, 605 Steed Road
> Ridgeland, Mississippi 39158
>
> *Attorneys for Plaintiffs Union Insurance Company, as Successor in Interest to Great River Insurance Company*

This the 30th day of August, 2010.

BY:   <u>*s/Lee Ann Thigpen*</u>
      Lee Ann Thigpen