IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNION INSURANCE COMPANY, as
Successor in Interest to Great River
Insurance Company                                                    PLAINTIFF

VS.                                              CAUSE NO. 3:09CV283-HTW-LRA

TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT, FIDELITY & GUARANTY
INSURANCE UNDERWRITERS, INC. and
UNITED STATES FIDELITY & GUARANTY COMPANY       DEFENDANTS

## UNION STANDARD INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO TRAVELERS MOTION FOR SUMMARY JUDGMENT

This action was initiated by Union Standard Insurance Company ("USIC") for declaratory judgment and for contribution to recover from defendant Travelers Insurance Company settlement funds overpaid by USIC, and underpaid by Travelers, in the compromise and settlement of an underlying silicosis lawsuit brought against the common insured of USIC and Travelers, Custom Aggregates, Inc.  The facts surrounding the settlement of the underlying lawsuit are laid out at length elsewhere, and USIC will not extend this memorandum with another explanation of the circumstances.  It is sufficient to say that underlying plaintiff Clifton Gatlin, now deceased, sued common insured, Custom Aggregates, for 104 months of silicosis exposure, during which Custom Aggregates was insured for 51 months by Travelers and for 24 months by USIC.  The remainder of the 104 month duration was insured

by Kemper and by Zurich, neither of which are parties to this litigation. Each carrier issued policies to Custom Aggregates with maximum liability coverage per policy of one million dollars. The underlying lawsuit was settled for the sum of 1.75 million dollars, and Travelers, though it insured Custom Aggregates for 48.57 percent of the 104 months of the continuous tort, declined to pay that percentage of the total settlement. Instead, Travelers agreed to pay 48.57 percent of one million dollars, it being Travelers' express contention that the maximum coverage available to Custom Aggregates was only one million dollars divided among the four different carriers. It underscores Travelers' position when one observes that Travelers paid precisely 48.57 percent of One Million Dollars or $485,570.00.

Both parties, USIC and Travelers, have now filed motions for summary judgment. This memorandum of law is offered by USIC in opposition to the motion for summary judgment filed by Travelers. By separate memorandum, USIC has supported its own motion for summary judgment. Subsequently, USIC will file another, a rebuttal memorandum, to support its motion for summary judgment. Again, however, this memorandum of law is offered in opposition to the Travelers' motion for summary judgment.

## I.
## SUMMARY

Before discussing at length the various issues raised by Travelers in its motion and its supporting memorandum, USIC will summarize Travelers' position and its arguments. The Travelers motion and its supporting memorandum provide a curious amalgam of misstatement, misrepresentation and sophistry. Repeatedly, both in its

memorandum and in its supporting exhibits, Travelers misstates facts, misstatements which are often disproven by the very exhibits offered by Travelers to support its position. First, Travelers argues repeatedly that it did not consent to settlement, but its supporting documentation makes clear that Travelers agreed to, and did, fund settlement with $485,700.00 of Travelers indemnity money. See Exhibit 3, Bates page 03441 (Travelers' in house counsel, Gerald Begley: "Travelers has agreed to pay $485,700 toward the Gatlin matter.... Travelers' payment of $485,700 constitutes its previously agreed upon (and pro rata) share of the settlement up to the one million dollar occurrence limit for this matter.") Second, Travelers' adjuster Claudette Savwoir supports the Travelers' motion with an affidavit, in which she asserts that, after October 4, 2007, "neither the insurers nor Custom consulted with Travelers any further regarding settlement negotiations ... or ... the merits." *See* Travelers' Exhibit "G" at 23-24. Then, in reliance on the Savwoir affidavit, Travelers' motion and memorandum declare repeatedly that Travelers was not consulted further about negotiations. *See* Travelers motion at 17; Travelers' memorandum in support at 5-6. That assertion, however, is patently untrue. *See* Travelers *Exhibits "R"* (Bates page 03342), "S" (Bates page 1447), "T" (Bates page 03414), "U" (Bates page 1354), "V" (Bates page 03423). *See also* USIC Exhibit "3" at Bates pages 1115-21, 1122, 1129-30, 1291, 1287, 1283, 1103, 1107, 03364, 03427-29, 03432-34, 03436-37. Third, Travelers repeatedly denies agreeing to litigate after settlement was finalized, but emails from Travelers own officers and attorneys specifically acknowledge that the various carriers reserved the right, after settlement,

3

to "seek contribution." *See* Exhibit 3, Bates pages 1287 and 03364 (Begley again: "Travelers acknowledges that the carriers have reserved their rights to any contribution claims to which they believe they may be entitled…."). See also Exhibit 3, Bates pages 03438-03443.   Litigation to seek "contribution" is precisely what this lawsuit is about.  Even so, Travelers says it did not agree to litigate post settlement about the allocation of settlement funds and whether it owed additional settlement monies to the other carriers.     Fourth, Travelers engages in the arcane sophistry of misstating the USIC position, thereby setting up a proverbial "strawman."   Travelers declares that USIC seeks to stack policy coverages, which is notUSIC's position (as Travelers has been repeatedly told).  Then, after constructing the strawman (stacking), Travelers proceeds to knock down that strawman, all the while exulting that the demise of stacking means the demise of USIC's case.  Since the strawman never approximated USIC's position, however, the demise of the strawman denotes nothing to this litigation.

The true bottom line, though, is that Travelers seeks to rewrite its insurance policy.   The Travelers policies establish a one million dollar limit for "Each Occurrence."   *See, e.g.* Exhibit "5" at Bates page 3191.  The policy then says that "the Each Occurrence Limit is the most we [Travelers] will pay for … all 'bodily injury' and 'property damage' arising out of any one 'occurrence.'" *See* Exhibit "5" at Bates page 3201.  Since the Each Occurrence Limit is one million dollars, then Travelers committed under its policy that one million dollars is the most it would pay for bodily injury arising out of any one occurrence.   That was its solemn contractual

4

duty.   If Travelers prevails in its motion for summary judgment, however, Travelers will have effectively rewritten its policy to say that the most it will pay for any bodily injury arising out of any one occurrence is, not one million dollars, but, instead, $485,700.00.   *See* Exhibit 3, Bates page 03441 (Begley once more:  "Travelers' payment of $485,700 constitutes its previously agreed upon (and pro rata) share of the settlement up to the one million dollar occurrence limit for this matter.")

This is a policy rewrite which this court should not endorse.  The Travelers motion for summary judgment should be denied.  The USIC motion for summary judgment should be granted.

## II.
## TRAVELERS CONSENTED TO SETTLEMENT

Travelers' first argument in support of its summary judgment position is that it did not consent to settlement and that its lack of consent precludes USIC's contribution action and necessitates the entry of summary judgment for Travelers. Even if Travelers be correct that a lack of consent to settlement would prevent the prosecution of this action for contribution (which is not conceded), the underlying premise is false.  Travelers clearly consented to the settlement of this lawsuit, and its contention otherwise is disingenuous.  Far from refusing to consent to settlement, Travelers paid almost half a million dollars to fund the settlement.  To contend that it did not consent to settlement, even though it paid so significant a sum to effect settlement, approaches Orwellian Newspeak.

Moreover, the language of Travelers' officers, adjusters and attorneys, as they proceeded to fund the settlement, make it quite clear that they agreed to the settlement

and consented to pay $485,700.00 to help fund that settlement.  In the language of Travelers in house counsel Gerald Begley, by email of October 9, 2007:

> As previously stated, Travelers will agree to pay, based upon the previously negotiated defense costs shared, 48.57 percent towards settlement of this lawsuit up to the One Million Dollar single occurrence limit or Four Hundred Eighty Thousand Five Hundred and Seventy Dollars.

*See* Exhibit "3," at Bates page 1287.  Likewise, by email of October 18, 2007, to the undersigned, Travelers attorney Gerald Begley announced:

> Travelers has agreed to pay $485,700.00 toward the Gatlin matter.... Travelers' payment of $485,700.00 constitutes it's previously agreed upon (and pro rata) share of the settlement up to the One Million Dollar occurrence limit for this matter....
>
> Finally, while Travelers believes its position with respect to the occurrence limit is correct, we remain open to discussion on this matter.

*See* Exhibit "3," at Bates page 03441.

It is logically impossible for Travelers to deny it consented to settlement when: 1) it paid $485,7000.00 to fund the settlement; and  2) it said repeatedly, in the voice of its counsel, Gerald Begley, that it agreed to pay and partially fund the Gatlin settlement.  Indeed, on these facts, Travelers' attempt to deny consent is reminiscent of Lord Byron's Julia who, in *Don Juan, Canto I,* declared while "whispering 'I will ne'er consent' – consented." *See Everson v. Board of Education*, 330 U.S. 1 18-19, 67 S. Ct. 504, 513, 91 L. Ed. 711, 725 (1947) (Mr. Justice Jackson, dissenting). Even so, Travelers has done Julia one better.  Julia said she would not consent, but did consent nonetheless.  Travelers, on the other hand, says it consents, then does consent, but argues nevertheless that it did not.

Even so, Travelers consented to settlement and helped fund settlement. Any protestation to the contrary is incredible and not to be believed. This argument by Travelers is without merit.

### III.
### USIC'S OVER PAYMENT WAS NOT MADE VOLUNTARILY

Next, Travelers invokes the voluntary payment rule to argue that USIC cannot sue for contribution to recover Travelers' underpayment because USIC voluntarily paid the excess sum of $291,450.00 to capture the settlement that otherwise would have been lost. To show the fallacy of this argument, we will begin with the factual setting and then turn to the legal principles that show that the USIC payment was not voluntary.

First, the facts. The trial date for the Gatlin lawsuit was October 15, 2007, a date that was set by the Hinds County Circuit Court during a motion hearing conducted on July 13, 2007. *See* Exhibit "3" at Bates pages 02556-02557. Thereafter, mediation was scheduled and held September 27, 2007. In the days preceding the mediation, the four carriers communicated among themselves, and with defense counsel, to obtain settlement authority for use in the mediation. On September 24, 2007, less than a month before trial, and four days before the mediation, Travelers adjuster Claudette Savwoir told the other carriers that she had requested from her superiors her share of up to 1.5 Million Dollars for authority to be used in the mediation. *See* Exhibit "3" at 1031. On that same day, September 24, 2007, Travelers adjuster Claudette Savwoir wrote an email to all the other adjusters acknowledging that others had also asked for their share of 1.5 Million Dollars in

authority, and Savwoir said "I don't think that is going to settle this case. But I don't know that I will have any more authority than that." *See* Exhibit "3" at Bates pages 1032-1033.

The mediation was conducted September 27, 2007. Before Custom Aggregates (the common insured of Travelers, USIC, Kemper and Zurich) disengaged from the mediation, Custom Aggregates offered $800,000.00 to settle the case, which offer was refused by plaintiffs. Custom Aggregates then told plaintiff it would pay one million dollars if plaintiff would agree to take it. In response, plaintiff announced that he would settle for four million dollars. Custom Aggregates then disengaged from the mediation, even though codefendant Precision Packaging continued to mediate and ultimately settled at the mediation. The Precision Packaging settlement terms were confidential. *See* Exhibit "3" at Bates pages 0990-0991.

The day after the mediation, September 28, 2007, approximately 2.5 weeks before trial, Travelers adjuster Claudette Savwoir authored an email that expressed her opinion that, if Custom Aggregates could settle for even $100,000.00 less than Precision Packaging had paid, it would be considered a win. *See* Exhibit "3" at Bates page 1003. That same day, September 28, 2007, Travelers in house counsel, Gerald Begley, said that even though the Precision Packaging settlement was confidential, he believed Precision had paid 1.5 Million Dollars. Begley further said he thought Precision Packaging had panicked but that "it doesn't mean we won't have to pat (*sic*) similar money." *See* Exhibit "3" at 1012.

Thereafter, though Travelers adjuster Savwoir and Travelers attorney Begley had just recently indicated their perceptions of the value of the claim and the likely cost of settlement, Travelers took action that wholly upset the applecart, the previously unified front provided by the four insurance carriers.  On October 4, 2007, only eleven days before the scheduled trial date, Travelers issued a Policy Limit Notification letter to Custom Aggregates by which it announced for the first time its position that only one million dollars in coverage was available from all carriers combined and that it would offer towards settlement only 48.57 percent of that sum or $485,700.00.  *See* Exhibit "3" at Bates pages 03270-03272.  This apparent reversal of position with only eleven days remaining before trial, caused protests from Custom Aggregates and from fellow insurers Zurich, Kemper and USIC.  *See* Exhibit "3" at pages 1115-1121;  1122;  03167-03169;  03432-03434.  Protests also emanated from Custom Aggregates counsel, Steven Funderburg and from defense counsel Fred Krutz.  *See* Exhibit "3" Bates pages 1185;  03436-03437.

On October 9, 2007, approximately six days before trial, defense counsel for Custom Aggregates settled the Gatlin lawsuit for 1.75 million dollars.  *See* Exhibit "3" at Bates page 1291.  This agreement was reached after days of negotiations between Custom Aggregates, the plaintiff, and all insurance carriers, including Travelers.  Indeed, Travelers, by way of its employees Begley and/or Savwoir, was copied with each email that memorialized the negotiating process.  *See* Travelers *Exhibits "R"* (Bates page 03342), "S" (Bates page 1447), "T" (Bates page 03414), "U" (Bates page 1354), "V" (Bates page 03423). *See also* USIC Exhibit "3" at Bates

pages 1115-21, 1122, 1129-30, 1291, 1287, 1283, 1103, 1107, 03364, 03427-29, 03432-34, 03436-37.

The $1.75 Million settlement was reasonable.  By email of August 15, 2007, Forman Perry defense counsel Win Gault informed the liability carriers that the Gatlin lawsuit was "a very, very serious case – the worst I've ever seen ...." *See* Exhibit "3" at Bates 02593-02594.  The Forman Perry pretrial assessment noted that this was an unusual silicosis case in that there was no medical defense, and the plaintiff's injuries were undeniable.  Furthermore, there was no product identification defense.  The economic damages for the case totaled approximately $2.5 Million Dollars, including more than a half million dollars for a double lung transplant operation performed upon the plaintiff.  Forman Perry noted plaintiff to be a non-smoker, thirty-seven years of age, with anticipated non-economic damages of between $2.5 and $7.5 Million.  The pretrial assessment pointed out that the Mississippi tort reform statutes applied only to cases filed after September 1, 2004, and the Gatlin suit was filed two weeks before that, on August 16, 2004.  Therefore, the Mississippi Tort Reform Act, including limits on non-economic damages, did not apply.  The pretrial assessment further indicated that the fault likely to be allocated to insured Custom Aggregates was twenty percent because of testimony that twenty percent of the employer's sand (used for sandblasting) came from Custom Aggregates.  Consequently, Forman Perry anticipated a verdict range of $5 Million Dollars to $10 Million Dollars and requested settlement authority in the amount of $1.5 Million.  *See* Exhibit "3" at Bates pages 1091-1099.  Thereafter, Forman Perry counsel Fred Krutz, emailed Travelers' counsel

Gerald Begley on October 3, 2007, advising him that Custom Aggregates sold more

sand to Gatlin's employer than plaintiff Gatlin knew and that the demands of plaintiff

Gatlin could go higher as a result.  *See* Exhibit "3" at Bates page 1185.

On that same day on which the settlement agreement was announced, October

9, 2007, Travelers counsel Gerald Begley drafted a letter to all other carriers

announcing that Travelers agreed to pay toward settlement the sum of $485,700.00,

which figure Begley specifically linked to "previously negotiated defense costs

shared, 48.57 percent towards settlement of this lawsuit up to the One Million Dollar

single occurrence limit."  *See* Exhibit "3" at Bates page 1287.  In that same email,

dated the day of settlement, Begley also said:

> Travelers acknowledges that the carriers have reserved their rights to
> any contribution claims to which they believe they may be entitled and
> Travelers respectfully reserves its rights with respect to both the
> reasonableness and voluntariness of this settlement in addition to, all
> rights previously reserved in this matter and/or positions taken.

*See* Exhibit "3" at Bates page 1287.

On October 11, 2007, Rita Beck of USIC drafted a letter and emailed it to

Gerald Begley of Travelers which read in its entirety as follows:

> Dear Mr. Begley:
>
> A copy of your email reserving Travelers' rights has been forwarded to
> my attention.  This email demands a full and final release in return for
> Travelers' payment of 48.57% of $1,000.000, a payment that is
> $364,275 short of your correct pro rata share of the $1,750,000
> settlement in the Gatlin case.  No such release restriction was placed on
> your offer to pay $485,700 until after the settlement was reached.
>
> By taking the coverage position outlined in your letter 10/04/2007 to
> Suzy McDonald of Custom Aggregates, Travelers has breached its
> longstanding apportionment agreements with Union, Zurich and

Kemper less than two weeks before trial in the   Gatlin case. Furthermore, Travelers has failed to provide any convincing support for its new position.

As a result of Travelers' breach, Union Insurance Company and Zurich Insurance Company have agreed to fund the balance of Travelers' pro rata share with the understanding that both companies intend to seek reimbursement from Travelers.  Union's agreement to fund the Gatlin settlement beyond its pro rata share is made because of its solemn duty to negotiate and settle claims in the insured's best interest.  Travelers shares this same duty to the insured, but it has chosen to breach it.

Union has agreed to pay a portion of the indemnity obligation of Travelers not by choice but by legal obligation, under compulsion and due to the paramount obligation owed by Union (and also by Travelers) to protect the best interests of the insured from the significant potential of a judgment in excess of policy limits.  The settlement in the amount of $1,750,000 is advisable, reasonable and prudent in every respect in view of the extent of injuries and damages suffered by plaintiff Gatlin, and in light of the probability, if not certainty, of a judgment against the insured.

At this point, we invite you to make a payment of your full pro rata share of the settlement, or $849,975 so that litigation between the carriers will not be necessary.  Or, the carriers can agree mutually to litigate the respective liabilities of the carriers between themselves after first settling the underlying Gatlin litigation.  <u>Please respond to this invitation by 12:00 noon Central Time on Friday, October 12, 2007.</u>

Sincerely,

Rita Beck
Litigation Specialist
UNION INSURANCE COMPANY

*See* Exhibit "3" Bates page 03433-03434. (Emphasis in original.)

Then, on October 15, 2007, the  undersigned counsel for USIC, J. Stephen Wright, emailed Travelers' Gerald Begley to confirm a telephone conversation between the two.  That email recited the following:

Gerald:

Thank you for the telephone conversation of 10-15-07. This email will confirm our mutual understandings from that communication. We agreed: 1) Travelers, though it may only pay $480+/-K toward the $1.75 Million to settle the Gatlin litigation for insured Custom Aggregates, will not expect or require releases from the insured or the other insurers, including USIC; 2) Travelers will negotiate now and after settlement relative to it paying more of the settlement funds; and 3) if satisfactory resolution of this issue (Travelers contractual share of the indemnification funding) cannot be reached by agreement, then Travelers agrees to litigate with USIC and the other carriers post settlement to allow the courts to resolve the issue. With this understanding in place, no payment by USIC or other carriers can be characterized as voluntary.

Let me know if I misstate our conclusions and agreement.

Thanks.

J. Stephen Wright
Wright & Martin, LLP

*See* Exhibit "3" Bates 03438.

In response, Travelers Gerald Begley penned an email to the undersigned, J.

Stephen Wright, on October 18, 2007:

Mr. Wright:

I am in receipt of your recent emails, two dated October 17, 2007 as well as your prior email of October 15, 2007 which confirms the subject matter of our conversation earlier that day.

With respect to your recent questions; First, Travelers has agreed to pay $485,700 toward the Gatlin matter. Second, as we have also discussed, Travelers' position is that there is a single, one million dollar per occurrence limit of liability available for this matter. The Gatlin matter involves a single plaintiff and correspondingly a single occurrence. Thus, based upon the occurrence limit, one million dollars is the total limit of liability available for this occurrence under all primary policies.

Travelers payment of $485,700 constitutes it's previously agreed upon (and pro rata) share of the settlement up to the one million dollar occurrence limit for this matter.

. . .

Finally, while Travelers believes its position with respect to the occurrence limit is correct, we remain open to discussion on this matter. Additionally, as Travelers continues to harbor concerns over the reasonableness of the amount of the settlement and as it is my understanding that a new matter has been scheduled for trial, I believe that it is in everyone's interest to postmortem the events which lead to this 1.75 million dollar settlement and the manner in which the defense of it was handled.

. . .

*See* Exhibit "3" at Bates page 03441.

This is the factual background upon which Travelers voluntary payment argument must be assessed. The legal framework for that assessment is discussed below.

The binding precedents are *Guidant Mutual Ins. Co. v. Indemnity Ins. Co. of North America,* 13 So. 3rd 1270 (Miss. 2009) and *State Farm Mutual Automobile Ins. Co. v. Allstate Ins. Co.,* 255 So. 2d 667 (Miss. 1971). The *State Farm* decision first announced the rule for Mississippi that a volunteer, as in one who makes a voluntary payment, is a "stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay." *State Farm,* 255 So. 2d at 669. The court then held that State Farm which had paid a settlement in which Allstate refused to participate, did not fit the definition of a volunteer and was instead "under a solemn obligation to defend its insured, to negotiate and settle all claims made against its insured, first according to … [the insured's] best interest, and then, secondly, according to State

Farm's best interest." *Id.*   Consequently, said the Mississippi Supreme Court, State Farm was not a volunteer, and its payment was not a voluntary payment. Therefore, State Farm was entitled to recover from Allstate one half of settlement costs it had paid to obtain the release of the insured of the two companies, State Farm and Allstate.

The Mississippi Supreme Court in *State Farm* also quoted Appleman on *Insurance Law and Practice* to say:

> The majority of cases now recognize the undesirability of rewarding the insurer which refuses to honor its contractual obligations, and hold that payment by an insurer which properly undertakes a burden of settlement or defense does not render it a volunteer, not entitled to recover.

*State Farm,* 255 So. 2d at 669, (quoting 8 Appleman, *Insurance Law and Practice,* § 4913, page 398).

Likewise, the *Guidant* decision, rendered just last year, relied expressly upon *State Farm* to hold that a claim of contribution can proceed so long as the overpaying insurance carrier "can prove it was legally liable to settle, and that the amount it paid the injured party or parties was reasonable." *See Guidant Mutual*, 13 So. 3d at 1280. *Guidant Mutual* further distinguished a claim of contribution, such as USIC pursues here against Travelers, noting contribution to differ from an indemnity case which would be blocked by a voluntary payment. *Guidant* appears to acknowledge "that, in an indemnity case, a party may not seek reimbursement following voluntary settlement without proving that '(1) it was legally liable to an injured third party, (2) that it paid under compulsion, and that (3) the amount it paid was reasonable.'" *See*

*Guidant,* 13 So. 3d at 1280.  Nevertheless, while acknowledging this to be the law in an indemnity case, the Supreme Court noted that "this case [that is, *Guidant*] concerns the issue of contribution, not indemnity."  *See Guidant* 13 So. 3d at 1280.  *Guidant* then held that a claim of contribution, as USIC pursues against Travelers in the present case, only requires USIC to prove itself to be legally liable to settle and that the amount paid was reasonable.  *Id.*

Even though *Guidant* confirms this reduced standard as the law in Mississippi, Travelers cites to the court the more cumbersome voluntary payment doctrine embodied in the Fifth Circuit case of *Genesis Ins. Co. v. Wausau Ins. Cos.,* 343 F.3d 733 (5 Cir. 2003).  Indeed, Travelers cites the *Genesis* decision in its supporting memorandum at pages 8, 9, 10 and 11, thereby evidencing Travelers clear perception that the *Genesis v. Wausau Ins.* ruling controls this court's decision as to whether USIC's settlement payments were voluntary and thereby unrecoverable.

Travelers' reliance upon *Genesis* is surprising.  The reason Travelers' reliance upon *Genesis* is so curious is found, clearly visible, in the recent case of *Travelers Prop. Cas. Co. of America v. Federated Rural Elec. Ins. Exch.,* 2009 U.S. Dist. LEXIS 79801 (S.D. Miss. 2009).  For purposes of discussion here, *Travelers/Federated* can readily be called the "shoe on the other foot" decision.  In *Travelers/Federated,* Travelers found itself in a position much like USIC's position in this case.  Travelers and Federated each owed a defense to defendant Magnolia Electric Power Association ("MEPA") in a wrongful death action which arose in the context of a construction project.  In the midst of the defense, in which Travelers was

16

not participating, Travelers elected to settle on behalf of MEPA, and it requested that Federated participate in funding the settlement.  Federated declined.  Nevertheless, Travelers consummated the settlement and obtained releases for MEPA.  Before settling, Travelers asked Federated and MEPA to agree that Travelers payment would not be deemed voluntary.  Federated and MEPA declined to so agree and refused to consent to the settlement.  *See Travelers/Federated*, 2009 U.S. Dist. LEXIS 79801 at *2-3.

Thereafter, Travelers filed a declaratory judgment action, by which it sought contribution from Federated, just as USIC has filed this declaratory judgment action, in which it also seeks contribution.  The United States District Court, Judge Jordan, declined to order Federated to contribute to Travelers' settlement payments, holding that, as to settlement payments, Travelers was a voluntary payor and was not entitled to recover its voluntary payment to fund the MEPA settlement.  For this proposition, Judge Jordan relied specifically upon *Genesis Ins. Co. v. Wausau Ins. Co.,* 343 F.3d 733, 736 (5 Cir. 2003).  *See Travelers/Federated*, 2009 U.S. Dist. LEXIS 79801 at *12-13.  Days later, however, the Mississippi Supreme Court decided *Guidant,* and Travelers moved Judge Jordan to reconsider his decision, basing that motion on *Guidant.  Id* at 14.

In response to the motion to reconsider, Judge Jordan noted that though his opinion had been consistent with *Genesis Ins. Co. v. Wausau Ins. Co.,* "the Mississippi Supreme Court announced a different standard in *State Farm v. Allstate,*" which had been reaffirmed in *Guidant,* "handed down three days after this Court

entered the order in" *Travelers/Federated*. *Id* at *14-15. Consequently, Judge Jordan reconsidered his decision, reversed his ruling, and held that Travelers could indeed recover settlement payments from Federated by way of contribution. *See Travelers/Federated*, 2009 U.S. Dist. LEXIS 79801 *3, *11-20. Judge Jordan held:

> In sum, Travelers was no stranger to this action, owing MEPA the duty to defend, indemnify, and hold it harmless. Federated also owed a duty to the extent MEPA's negligence caused Murray's death, and yet it refused Travelers' tender. These facts bring the case in line with the policy exception to the volunteer rule announced in *State Farm* and affirmed in *Guidant,* a policy that reduces gamesmanship among carriers at the expense of injured parties and insureds.... Travelers may seek reimbursement of reasonable amounts paid to settle that portion of the claim associated with MEPA's negligence ....

*Id* at *19-20.

It is easy to see, then, why USIC considers *Travelers/Federated* the "shoe on the other foot" case. Travelers' position in that case is directly analogous to USIC's position in this case. The Federated argument in *Travelers/Federated* was directly analogous to Travelers' argument in this case. The initial decision of the United States District Court in *Travelers/Federated* is wholly consistent with the position argued by Travelers in the present case, and was rendered on the ill-fated authority of *Genesis Ins. Co. v. Wausau Ins. Co.* In this case, it is Travelers who cites *Genesis*, though one wonders why. *Travelers/Federated* acknowledged that the Mississippi Supreme Court had eroded *Genesis* and ruled, consistent with *State Farm* and *Guidant*, that Travelers was not a volunteer and could recover by way of contribution settlement payments made by Travelers without the consent of Federated. Even so, Travelers here makes the same argument that Federated made in *Travelers/Federated,*

an argument which is as doomed in this case as it was when Federated made those arguments in *Travelers/Federated.* (It is even more peculiar that Travelers, in *Travelers/Federated,* is represented by the very same law firm which today makes the Federated argument to this court. *Id* at *1.) Even so, the argument is not valid. Judge Jordan ruled against it, and this court should also.

The bottom line is that USIC was legally liable to settle for Custom Aggregates and the amount it paid to plaintiff Gatlin, the injured party, was reasonable. Therefore, USIC satisfies the elements necessary to make out its claim of contribution. USIC is not a voluntary payor.

Before closing this segment of the memorandum, it should be noted that Travelers tries, but fails, to distinguish *State Farm* and *Guidant* on the premise that in those cases the insurers who could not claim the voluntary payment doctrine were refusing to honor their contractual obligations to the insureds. *See* Travelers' Memorandum in Support at pages 12-15. In the first place, it is not true. In *Guidant*, INA (the recalcitrant insurer) "provided counsel to defend Marshall County and the fire department." *Guidant*, 13 So. 3d at 1274. Consequently, INA was not refusing to honor his contractual obligations to its insureds. Instead, it was honoring its defense obligations but refusing to consent to settlement. This is precisely what Travelers claims to be doing in this case. Consequently, the alleged factual distinction between the instant case and *Guidant* is no factual distinction at all.

Moreover, even if it were a factual distinction, it is a distinction without a difference. Nowhere in *Guidant* does the Mississippi Supreme Court say that it is

19

ruling as it is because Guidant refused to pay anything towards settlement, but that it would rule different if Guidant paid some, but not all, of its settlement obligations.

Likewise, *Travelers/Federated*, the "shoe on the other foot case," clearly reflects that "Federated retained and paid independent counsel to represent MEPA." *Travelers/Federated*, 2009 U.S. Dist. LEXIS 79801 at *2. Moreover, in that case, "Travelers had not participated directly in the defense of the ... wrongful death case, [but] it elected to settle on MEPA's behalf." *Id.* Consequently, it cannot be said in *Travelers/Federated* that either carrier was fully involved in defense and settlement or was fully engaged in satisfying its contractual duties to the insureds. Nevertheless, Judge Jordan clearly held that *Guidant,* not *Genesis*, controlled and that Travelers could recover settlement payments which it had made but that Federated should have paid.

Consequently, Travelers' attempt in this case to distinguish *Guidant* and *State Farm* on the grounds asserted, is not a valid measure by which this case can be distinguished from *Guidant* or from *State Farm*. Indeed, *Guidant* and *State Farm* control the instant case and require that Travelers pay USIC for settlement funds which USIC paid because it was legally obligated to defend the interests of the mutual insured, Custom Aggregates, and because the payments made were reasonable.

## IV.
## STACKING OR NO STACKING: THE STRAWMAN

In the final section of its memorandum, Travelers contends that USIC asks this court to impose a horizontal stacking rule upon this controversy. This is simply not true. USIC does not endorse stacking, which would aggregate liability coverage by

adding the per occurrence limit from each policy year to reach a total, which in this case, would approximate nine million dollars. This is not USIC's contention. And, it has never been USIC's contention.

Instead, USIC's position is that which is outlined in "famous footnote 28" of the *48 Insulations* case. *Insurance Co. of N.A. v. Forty-Eight Insulation,* 633 F.2d 1212, 1226 n.28 (6 Cir. 1980). Under that standard, each carrier, no matter how long it insured Custom Aggregates, would be responsible for only one year's occurrence limit. Consequently, Travelers, which insured Custom Aggregates under five policies, would be subject to maximum exposure of one occurrence limit or one million dollars. Likewise, USIC, which insured Custom Aggregates for two policy periods, would also be potentially liable for one year's occurrence limit, also one million dollars. Kemper and Zurich, though not parties to this litigation, were also under a one year occurrence limit of one million dollars each. This is not stacking. Instead, it is the rule of *48 Insulations.*

Indeed, one of the cases cited by Travelers for the proposition that this court should not endorse stacking states unequivocally that the *48 Insulations* rule is not stacking. *See Chicago Ins. Co. v. Pacific Indem. Co.,* 566 F. Supp. 954 (E.D. Pa. 1982).

> Plaintiff cites recent developments in the law of insurance as it relates
> to the asbestos industry. In *Insurance Co. of North America v. Forty-*
> *Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir. 1980), the court
> adopted the "exposure" theory, and ruled that each of several insurance
> companies which were on the risk at various times must provide
> coverage for a pro rata share of the damages sustained as a result of
> prolonged exposure to asbestos fibers. Under that ruling, an insurance
> company, which, for example, provided products liability coverage

during three of the twelve years in which the plaintiff was exposed to asbestos fibers manufactured by the insured would be required to bear one-fourth of the financial burden of the resulting asbestosis. But this approach is premised upon the concept that "bodily injury" within the meaning of the policies in question occurred with each inhalation of asbestos fibers which reached the lung and lodged there. In our case, Mrs. Pfeifer did not sustain separate injuries each time the doctor failed to order a biopsy. *Moreover, and more importantly, the Forty-Eight Insulations court expressly held that no one company would be liable for amounts in excess of the limitations expressed in whichever single insurance policy provided the highest limits. "Stacking" coverages would not be permitted, since that would give the insured more than was bargained for.*

*Chicago Ins. Co.*, 566 F. Supp. at 957.  (Emphasis added.)  In addition, the United States Court of Appeals for the Fifth Circuit has made clear its approval of the *48 Insulations* rule. *See Porter v. American Optical Corp.,* 641 F.2d 1128, 1145 (5 Cir. 1981).

Travelers cites a number of cases for the proposition that stacking should not be condoned.  Since USIC does not argue for stacking, which is nothing more than Travelers' strawman, this memorandum will not devote considerable space to challenging the contention.  Nevertheless, it should be noted that most, if not all, the cases cited by Travelers at pages 15-19 of its memorandum argue for a proposition which is consistent with the position of USIC in this case.  That position is that stacking should not be allowed, but each carrier should be responsible for one occurrence limit under the policies issued by that carrier.  None of those cases would appear to say, as Travelers argues here, that a carrier who has accepted the premium for an occurrence limit is liable only for half that occurrence limit.  *See generally Madison Materials Co. Inc. v. St. Paul,* 523 F.3d 541 (5 Cir. 2008); *Chicago Ins. Co.*

*v. Pacific Indem. Co.,* 566 F. Supp. 954 (E.D. Pa. 1982); *Hartford Casualty Ins. Co. v. Medical Protective Co.,* 641 N.E. 2d 545 (Ill. App. 1994); *American Physicians Ins. Exch. v. Garcia,* 876 S.W. 2d 842 (Tx. 1994).

## VI.
## SUMMARY

Travelers' motion for summary judgment should be denied. Travelers did consent to the underlying settlement of the Gatlin lawsuit. USIC was not a voluntary payor, and the settlement paid to resolve claims against Custom Aggregates was not a voluntary payment. The Mississippi Supreme Court has clearly endorsed claims for contribution, such as the one prosecuted here by USIC, and USIC has established its entitlement to contribution by showing it was legally obligated to settle to protect the insured, Custom Aggregates, and that the amount of the settlement was reasonable. Finally, USIC does not argue for stacking, but instead, for the proposition that, in continuous exposure toxic tort cases, each carrier should honor its contractual obligation to pay up to one occurrence limit for bodily injury caused by an occurrence occurring during one or more of its policy periods. This is consistent with famous footnote 28 of *48 Insulations,* a decision wholeheartedly endorsed by the Fifth Circuit in *Porter v. American Optical Corp.*

Travelers' motion for summary judgment should be denied. USIC's motion for summary judgment should be granted.

Respectfully submitted,

UNION INSURANCE COMPANY

S /    J. STEPHEN WRIGHT
Attorney for Plaintiff

OF COUNSEL:

J. STEPHEN WRIGHT, ESQ. (MSB #7400)
JAMES C. MARTIN, ESQ. (MSB # 1890)
WRIGHT & MARTIN, LLP
605 Steed Road
Post Office Box 1950
Ridgeland, Mississippi  39158
Telephone:  (601) 856-0000
Facsimile:  (601) 856-5767

## CERTIFICATE OF SERVICE

I, J. Stephen Wright, one of the attorneys for plaintiff, do hereby certify that I have this day electronically served  a true and correct copy of the foregoing to the following:

Lee Ann Thigpen, Esq.
lthigpen@cwplaw.com

This the 16th day of September, 2010.

S /    J. STEPHEN WRIGHT