IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNION INSURANCE COMPANY, as Successor in Interest
to Great River Insurance Company                                    PLAINTIFF

VS.                                          CIVIL ACTION NO. 3:09-CV-283 HTW-LRA

THE TRAVELERS INDEMNITY COMPANY OF
CONNECTICUT, FIDELITY AND GUARANTY
INSURANCE UNDERWRITERS, INC., AND
UNITED STATES FIDELITY AND GUARANTY COMPANY               DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before this court are the opposing motions for summary judgment filed by the plaintiff

and the defendant.  The Travelers Indemnity Company of Connecticut and its subsidiaries filed a

motion for summary judgment under the auspices of  Rule 56 of the Federal Rules of Civil

Procedure[1].  In their motion these defendants contend that there are no material facts in dispute

and, as a matter of law, it owes no funds to the plaintiff, Union Insurance Company.  Travelers

seeks a declaratory judgment in its favor barring Union's claims against it. **[doc. no. 31].**

Union Insurance Company ("Union") also filed a motion for summary judgment,

asserting that Union is entitled to judgment in its favor, as a matter of law, and asks the court to

issue a declaratory judgment that Travelers is required to pay the amounts for which Union has

---

[1] 1 Rule 56(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that:
 "[a] party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."
Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, the following:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

sued. **[doc. no. 33].** The motions of both parties, in reliance upon Rule 56 of the Federal Rules of Civil Procedure, contend that there are no genuine issues of material fact.

At the heart of this dispute is Union's effort to obtain contribution from Traveler's for a claim paid by Union, and for which Travelers was partly liable. Travelers admits that it has some liability under the policy in question, but disagrees that it owes any amount over what it has already agreed to pay, the amount Travelers claims to be its proportionate share of a $1 million dollar policy limit.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    PARTIES AND JURISDICTION

Plaintiff Union is an Iowa insurance company with corporate headquarters and its principal place of business located in Urbandale, Iowa. Union acknowledges that it is a successor in interest to Great River Insurance Company, the company that wrote the polices at issue here -- policies insuring Custom Aggregates & Grinding, Inc. ("Custom"), against liability claims.

Defendants Travelers Indemnity Company of Connecticut, Fidelity & Guaranty Insurance Underwriters, Inc., and United States Fidelity & Guaranty Company are subsidiaries of the Travelers Companies, Inc., which is a Connecticut insurance holding company with its corporate headquarters and principal place of business located in Hartford, Connecticut. The Traveler's Entities will be referred to collectively as "Travelers".

As authorized by Title 28 U.S.C. § 1332 (a),[2] this court has subject matter jurisdiction over plaintiff's claims and related motions based on diversity of citizenship. The parties are

---

[2] 28 U.S.C. § 1332 states in pertinent part:

(a)  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

(1) citizens of different States;

completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs, as Union's complaint demands declaratory judgment regarding an alleged debt of $291,450. Venue is proper pursuant to 28 U.S.C. §1391. In this diversity action, the substantive laws of the State of Mississippi apply. *Klaxon Co. v. Stentor Elec. Mfrg. Co* 313 U.S. 487m 496 (1941). See also *Boardman v. United Services Auto, Ass'n,* 470 So.2d 1024, 1032 (Miss. 1985); *Guaranty Nat. Ins. Co. v. Azcock Industries, Inc.,* 211 F.3d 239, 243 (5th Cir. 2000).

## II. STIPULATED FACTS

On August 16, 2004, Clifford Gatlin ("Gatlin"), who had been employed as a sandblaster and foundry worker, filed a lawsuit in the Circuit Court of Hinds County, Mississippi. Gatlin alleged that his work environment had been contaminated with silica dust, causing him to develop silicosis, a serious health condition caused by exposure to inhaling silica dust over a period of time. Gatlin sued, in Hinds County Circuit Court, his employer and other defendants, including Custom Aggregates & Grinding, Inc. ("Custom"). Custom was one of the companies that had supplied to Gatlin's employer sandblasting material that allegedly contained the injurious silica.

During the relevant period during which Custom was supplying materials to Gatlin's employer and during which time Gatlin was an employee there, Custom was insured by the following four companies: 1) Great River Insurance Company (whose successor in interest is Union); 2) The Travelers Indemnity Company of Connecticut; 3) Zurich North America; and 4)

---

(c) For the purposes of this section and section 1441 of this title--

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated, and of the state or foreign state where it has its principal place of business . . .

Kemper Insurance Company (collectively, "Insurers"). These insurers had policies in effect with Custom at different times over the relevant period. None was in effect concurrently. Each annual policy, regardless of which insurer issued it, carried primary liability limits of One Million Dollars.

All four of these insurers entered into a joint defense agreement whereby each insurer agreed to contribute to the legal fees and expenses incurred by Custom in defense of the Gatlin lawsuit. The four companies agreed to a formula, which was included in the joint defense agreement, that allocated a percentage for each insurer to pay based on the proportionate length of time of coverage that each had provided to Custom during the relevant period (also referred to as "time on the risk"). The continuing tort, it was determined, spanned approximately 104 months. The Insurers agreed to a percentage allocation of costs/liability as follows: Great River/Union 22.86%; Kemper 22.86%; Zurich 5.71%; and Travelers 48.57 %.[3] The various subsidiaries and affiliates of the Travelers Companies had insured Custom for the longest period, and therefore, Travelers was obligated to pay the largest part of the settlement or verdict.

On July 13, 2007, the Insurers were informed that trial was set for October 15, 2007.[4] With mediation scheduled for September 27, 2007, and the trial less than a month away, Travelers and its adjusters, together with Union and the other carriers insuring Custom, pursued a potential settlement, with each carrier attempting to obtain authority for a total from all carriers of 1.5 million dollars. Travelers was a participant in this effort and on September 24, 2007, the adjuster for Travelers, Claudette Savwoir, informed the other insurers that she had requested authority for her share of up to 1.5 million dollars from her superiors. This, according to Union,

---

[3] Amended Complaint for Declaratory Judgment [Docket No. 8] ¶ 10.

[4] Defendants' Motion for Summary Judgment [Docket No. 31] ¶ 9.

was proof that up to that point, Travelers considered a settlement above one million to be within policy limits.

Travelers though, contends that around the time of mediation, Travelers and the other insurers discussed several legal arguments and defenses that had not been, but needed to be, developed. This, Travelers submits, is proof that Travelers did not believe a settlement valuation above $1,000,000 was reasonable.

The parties participated in mediation on September 27, 2007, but were unable to settle the claims against Custom. Custom's co-defendant, Precision Packaging, settled with the plaintiffs at the mediation, on confidential terms. At the conclusion of the mediation, Custom was the only remaining defendant.

On September 28, 2007, Travelers' adjuster, Claudette Savwoir authored an email to defense counsel, Forman, Perry, Watkins, Krutz & Tardy, regarding several legal defenses and arguments that Travelers was pushing and that Travelers said should have been developed a long time ago. On October 1, 2007, Claudette Savwoir and Gerald Begley, in-house counsel for Travelers, called Custom's representative Suzy McDonald and advised it was Traveler's position that only $1 million in total indemnity was available to Custom for the Gatlin lawsuit.

On October 2, 2007, Custom's defense counsel made to Gatlin an offer of $1,000.000, which was rejected. Negotiations continued over the next several days. On October 3, 2007, a member of the defense team from Forman, Perry, Watkins, Krutz & Tardy emailed Travelers' counsel Gerald Begley that Custom had actually sold a lot more sand to Gatlin's employer than plaintiff knew about and that Gatlin's demands would go higher once this error was realized. On October 4, 2007, with the trial set for eleven days later on October 15, 2007, Travelers issued a "Policy Limit Notification Letter" to Custom, reiterating its position that a single per occurrence

limit of one million dollars total was available from all carriers collectively, and informing all involved that Travelers would only offer 48.57 % of one million dollars or $485,700. While Travelers agreed to continue to honor its defense obligations, Travelers stated it did not agree to indemnify Custom for any amount above its 48.57 % share of the $1 million dollar limit.

On October 9, less than a week from the date of trial, which was set for October 15, settlement was reached between Custom and Gatlin, for the sum of $1.75 million dollars. Although the carriers had earlier agreed on the percentage each should pay, they disagreed on the combined policy limit and, therefore, on the sum to which each insurer's percentage should be applied. Union, Zurich and Kemper considered that the entire $1,750,000.00 settlement agreement was within combined policy limit. Travelers took the position that the carriers' liability was limited to a total of one million dollars. Travelers, then, instead of contributing a 48.57 % share of the 1.75 million dollar settlement amount, for a total of $849,975.00, limited its settlement contribution to $485,700.00, or 48.57% of its one million dollar policy limit, a difference of $364,275.00.

Kemper paid its proportionate share of the 1.75 million dollars under the formula. Union and Zurich, though, paid more than what they believed to be the just shares they owed pursuant to the allocation agreement. According to Union's amended complaint [doc. no. 8 at pp. 5-6], these two carriers did this "[t]o consummate the settlement agreement and to avoid the pending trial with its attendant risk to the insured ..." Defense counsel had informed the carriers that Custom could be exposed to as much as a $5 million to $10 million dollar liability. Union asserts that these additional payments were not voluntary, and were made under protest and with reservation of rights against Travelers.

The settlement agreement was paid as follows:

| | |
|---|---|
| Great River, predecessor in interest to Union | $691,500 |
| Kemper | $400,050 |
| Zurich | $172,750 |
| Travelers | $485,700 |

Union contends that what should have been paid is as follows:

| | |
|---|---|
| Great River, predecessor in interest to Union | $400,050 |
| Kemper | $400,050 |
| Zurich | $ 99,925 |
| Travelers | $849,975 |

Settlement was funded and consummated, and the Gatlin litigation was dismissed in Hinds County Circuit Court by final judgment with prejudice on April 6, 2009. Travelers contends that Union, Zurich and Kemper made the decision to negotiate above $1,000,000 and that Travelers did not consent to the decisions being made during the settlement negotiations. Union, on the other hand, claims that Travelers was kept informed by emails throughout the negotiations. In any event, when the settlement was reached on October 9, 2007, all parties were aware of Traveler's position that it would only be responsible for $485,700.

## III. PROCEDURAL HISTORY

Union, the Plaintiff herein, filed a Complaint for Declaratory Judgment [Docket No. 1] with this Court on May 8, 2009 and, with leave of the court, an Amended Complaint for Declaratory Judgment [Docket No. 8] on August 21, 2009. The Amended Complaint asks this Court to "declare the appropriate method in Mississippi for allocation of insurance coverage for a continuing tort for which the occurrence took place over a span of years which involved insurance policies provided by multiple insurance companies." [Docket No. 8 at p. 7].

On August 30, 2010, the Defendant, Travelers, filed a Motion for Summary Judgment [Docket No. 31]. Union also filed its Motion for Summary Judgment [Docket No. 33] on that

same date. This court has conducted hearings and conferences on the parties' opposing motions, and has requested and received additional briefing and proposed findings of fact and conclusions of law. The parties have also submitted a joint stipulation of facts. The Court must now consider these cross motions.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Copeland v. Nunan*, 250 F.3d 743 (5th Cir. 2001) citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.*" Celotex* at 322. The substantive law establishes those elements on which a plaintiff bears the burden of proof and only facts relevant to those elements are considered for summary judgment purposes. *Id.*

Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for facts demonstrating a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.* 276 F.3d 754. 759 (5th Cir. 2002); *SEC. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little v. Liquid Air corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant "but only when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075. When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S.133, 150 (2000).

**LEGAL ANALYSIS**

I.      TRAVELER'S MOTION FOR SUMMARY JUDGMENT

When cases are brought to federal courts on diversity grounds, state substantive law applies. *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 69 (5th Cir. 2014) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938)). *See also Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014) (court held that "when subject matter jurisdiction is based on diversity, federal courts apply the substantive law of the forum state"). This court, then, must apply the substantive laws of the State of Mississippi in making its decision.

**A. Voluntary Payment Doctrine**

Travelers, in its motion for summary judgment, asserts that the payments made above $1,000,000 for settlement of the Gatlin litigation, were 'voluntary payments' and Union cannot look to Travelers for recompense. Accordingly, this Court first must look to whether Union's payment toward the settlement of the *Gatlin* case was a voluntary payment. If the payment was voluntary, Union is not allowed to recoup the purported "excess" monies it paid in settlement of that lawsuit and the court need not inquire further. Summary Judgment would then be granted in favor of Travelers. "[A] voluntary payment cannot be recovered back…" *Genesis Ins. Co. v. Wausau Ins*. Co., 343 F.3d 733, 736 (5th Cir. 2003).

By contrast, if the purportedly "excess" payment made by Union was not voluntary, this court must proceed to its next inquiry— whether the $ 1.75 million dollar settlement amount exceeds the maximum aggregate liability amount for all four insurers combined and, if so, what amount, if any, is Travelers required to pay to Union? If either question cannot be resolved without deciding issues of material fact, the case must be submitted to a fact-finder. Both sides, however, contend that there are no material issues of fact to adorn this issue.

A major case which discusses the voluntary payment doctrine is *Genesis Ins. Co. v. Wausau Ins. Co.,* decided by the Fifth Circuit Court of Appeals. There, two insurers, Genesis Insurance Company and Wausau Insurance Company (hereafter "Genesis and Wausau"), agreed to pay for the defense and expenses of their insured, The President Casino (hereafter "President"). A customer had been seriously injured on the property of President by a casino-owned shuttle being driven by a casino employee. Both the automobile liability policy issued by Genesis and the premises liability policy issued by Wausau were implicated. *Genesis Ins. Co. v. Wausau Ins. Co.*, 343 F.3d 733 (5th Cir. 2003).

President and Genesis contended that their contributions to the settlement in that case had not been voluntary, but were the product of compelling circumstances created by Wausau. Wausau, they argued, by notifying the other companies of its intention to deny coverage with respect to a premises liability claim less than a month and a half before trial, had deprived both President and Genesis of the ability to mount an adequate defense. They claimed, therefore, they had been forced into participating in the settlement. The district court had disagreed, holding that, as a matter of law, a "lack of timely notice" does not shield them from the voluntary payment doctrine.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the district court's decision that Wausau's conduct did not compel President and Genesis to "throw their hats into the settlement ring." *Genesis* at 738." The appellate court amplified that the voluntary payment doctrine requires: (1) that there be no prior agreement by the parties to litigate coverage following settlement (e.g., parties agree that one will pay but they reserve the right to resolve coverage issues later); and (2) payments must not be made by virtue of legal obligation, by

accident/mistake or made under compulsion. *Genesis* at 738 (citing *McDaniel Bros. Constr. Co., Inc. v. Burk-Hallman Col*., 175 So.2d 603, 605 (Miss. 1965).

Not all pressure for payment amounts to compulsion, the court said, citing 16 Lee R.Russ. Couch on Insurance §223.28 (3d ed. 2003).

> Where a person pays an illegal demand, with full knowledge of all the facts which render the demand illegal, without *an immediate and urgent necessity to pay,* unless it is to release his or her person or property from detention or to prevent an immediate seizure of his or her person or property, the payment is voluntary. It is only when, in an emergency for which a person is not responsible, the person is compelled to meet an illegal exaction to protect his or her business interest that he or she may recover the payment, but if, with knowledge of the facts, that person voluntarily takes the risk of encountering the emergency, the payment is voluntary and may not be recovered.

66 Am.Jur.2d § 109 (emphasis added) as quoted in *Genesis* at 739.

This dilemma, the Fifth Circuit said in *Genesis,* first, lacks the sense of immediacy often accompanied by compelled payments, and secondly, "the stakes, in the event that President and Genesis refused to participate in the settlement, were of an insufficiently dire magnitude to justify finding that their settlement contributions were compelled." *Genesis* at 739. By way of examples, the Genesis Court cited to *Mobile Telecomm Tecnologies Corp. v. Aetna Cas. and Sur. Co.,* 962 F.Supp. 952 (S.D. Miss. 1997) and *Alcoa Steamship Co. v. Velez,* 285 F.Supp. 123, 125 (D.Puerto Rico 1968)   In *Mobile Telecomm,*. the district court found there was no compulsion where the insurer had a choice between making payments on its insured's $2 million legal bill or awaiting coverage determination and possibly paying an additional amount for the insured's interim financing. On the other hand, in  *Alcoa Steamship Co*., the district court held that the employer's payment of a workmen's compensation insurance premium was compelled, when the employer was faced with the alternative of losing all coverage. *Id* at 125.

Much like the plaintiff in the *Genesis* case, Union claims that Travelers' eleventh hour notice of limitations of coverage and the risk of exposing the insured to a much higher jury verdict compelled Union's action to settle. *Genesis,* however, stands for the proposition that even when the time of the trial is close or when the other insurer does not give timely notice of its intent to deny coverage, an insurer is not compelled to settle. *Id.*, 343 F.3d at 738 As Travelers points out, the *Genesis* case supports its contention that Union was not compelled to make the payment that it did to settle the Gatlin lawsuit.

In *Genesis,* the Fifth Circuit recognized that there was a dearth of Mississippi case law defining "under compulsion", and stated that the Court had to be guided by fact scenarios to reach the ultimate answer in the various cases presenting the "under compulsion" question.

Since *Genesis* was decided, more jurisprudence has been developed on the issue of voluntariness and contribution, especially by the Mississippi Supreme Court. After Genesis was decided by the Fifth Circuit Court of Appeals, the Mississippi Supreme Court, in 2009, decided *Guidant Mutual Ins. Co. v. Indemnity Ins. Co. of North America*, which addressed the voluntary payment doctrine. The *Guidant* case involved a volunteer fire fighter who had caused an accident while driving his personal vehicle on the way to fight a fire. He was a volunteer for the Marshall County, Mississippi, Fire Department. His auto insurer, Guidant Mutual Insurance Company ("Guidant") and Indemnity Insurance Company of North America ("INA"), the business automobile insurer for Marshall County, Mississippi, disputed which of them was the primary insurer. *Guidant Mutual Ins. Co. v. Indemnity Ins. Co. of North America,* 13 So.3d 1270 (Miss. 2009).

INA refused to participate in settlement negotiations despite being notified of the ongoing conversation, and while being asked to do so by Guidant.[5]  When INA refused to contribute to a settlement, Guidant settled and paid the claim, then sued INA for contribution. INA contended that Guidant had made a voluntary payment pursuant to the volunteer payment doctrine and thus could not recover any contribution from INA. *Guidant. v. Indemnity*, 13 So.3d 1270 (Miss. 2009).

Mississippi's highest court disagreed, holding that Guidant was entitled to move forward with its claim of contribution against INA.  *Guidant v. Indemnity*, 13 So.3d 1270, 1280 (Miss. 2009).  Where an insurer makes a settlement owed, at least in part, by another, state law should not reward the insurer that refuses to participate in the settlement.  The court continued, stating that INA was liable to the insurer, which properly undertook a burden of settlement, or defense, for contribution up to its stated limits of liability, <u>if</u> Guidant could prove it was legally liable to settle, and that the amount it paid was reasonable.  *Guidant v. Indemnity*, 13 So.3d 1270, 1280 (Miss. 2009) (citing *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 255 So.2d 667 (Miss. 1971).

The Mississippi Supreme Court's disposition in *Guidant,* was controlled by *State Farm Mutual Automobile Insurance Co. v. Allstate Insurance Co.,* 255 So.2d 667 (Miss. 1971).  In *State Farm,* the Court stated:

> The majority of cases now recognize the undesirability of rewarding the insurer which refuses to honor its contractual obligations, and hold that payment by an insurer which properly undertakes a burden of settlement or defense does not render it a volunteer, not entitled to recover.

*Id.* (quoting 8 *Appleman on Insurance* § 4913, 398).

---

[5] INA was insisting upon an agreement from Guidant that Guidant would reimburse INA for its defense costs. Guidant declined.

In *State Farm,* the Mississippi Supreme Court considered a case where an automobile owner had two insurance policies in effect. State Farm investigated the accident, and after determining that its insured would be liable for all damages and injuries, State Farm then made a demand on the other insurer, Allstate, to contribute to a settlement. Allstate refused. After negotiating and settling with all parties, State Farm thereafter sued Allstate for one-half of the $2,380.00 amount paid by State Farm in total settlement of all claims.

In that suit, Allstate responded that State Farm had been a volunteer as to the payment of $1,190.00, one-half of the total settlement, because State Farm's contract of insurance contained an 'other insurance' clause. That clause, contended Allstate, provided that in the event there is another insurer against the same loss, State Farm would be liable for no more than its proportionate share, based on the relative policy limits of the two companies. In that litigation, the two insurers had equal liability limits, so each would have been responsible for one-half of the loss. If State Farm was not contractually obligated to pay but one-half of the total, Allstate reasoned, the other half it paid was purely voluntary.

The Mississippi Supreme Court disagreed, stating that Allstate had lost sight of its obligation to its insured, as stated in its own policy. The Court there stated that both insurance companies "had entered into solemn contracts for a premium to defend the insured … against any and all claims, and to act in his [the insured's] best interest in negotiating and settling all claims made against him." That duty, the Court said, "transcends any hypertechnical right of either insurer to pay only in strict accord with the 'Other Insurance' clause of each contract." *State Farm v. Allstate* at 669. The court continued, "[s]urely, Allstate should not be allowed to take advantage of its own wrong. Surely it should not be rewarded for breaching its contract with its insured by refusing to defend him in any manner." *Id* at 669.

*Guidant,* continuing this mindset, established that, provided the amount is within policy limits, a payment is not voluntary if the insurer was legally liable to settle and the amount it paid was reasonable. *Id*. at 1280.

Union argues that in the instant case, its contractual obligation to defend Custom created a legal liability to settle because the insurance contract implicitly requires that Union place Custom's best interests before its own. Union also points to Travelers' unwillingness to provide sufficient funds to reach a settlement agreement as a breach of Travelers' duty to act in the best interest of the insured. Union compares Traveler's conduct to INA's refusal to defend or contribute to the settlement in the *Guidant* case.

Travelers says its conduct is different from that of INA in the *Guidant* case. Explains Travelers, INA (a) did not participate in negotiations, (b) discontinued paying legal defense costs and (c) refused to pay any part of the settlement. Travelers states it: (a) paid its share of the legal defense of Custom; (b) participated in settlement negotiations up until a week before the trial date; and (c) tendered what it contended was its proportionate share of the settlement.

Union submits a counter argument, pointing to a federal district court case that was reconsidered based on the *Guidant* decision as evidence that the *Guidant* decision should control here and allow for contribution. In *Travelers Property Casualty Co of America v. Federated Rural Electric Ins. Exchange*, Travelers sued Federated for contribution after Travelers paid a settlement in a wrongful death case against the two insurance companies' mutual insured. *Travelers v. Federated,* Civ. Action No. 3:08-cv-83 DPJ-JCS, 2009 WL 2900027 (Sept. 3, 2009). In that case, Federal District Court Judge Daniel P. Jordan III, originally found that Travelers was "a volunteer for purposes of the settlement funds based on the Fifth Circuit's

holding in *Genesis* that the mere "payment under 'protest' or accompanied by a unilateral reservation of rights will not escape the application of the volunteer doctrine." *Id* at 14.

Approximately one week after the district court's ruling in favor of Federated Electric in *Travelers v. Federated*, the Mississippi Supreme Court handed down its decision in *Guidant.* The district court reconsidered its ruling in *Travelers Property Casualty v. Federated Rural Electric,* based on the *Guidant* decision. Judge Jordan reversed his prior decision based on a policy exception to the voluntary payment doctrine first articulated by the Mississippi Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co* and then re-affirmed in the *Guidant* decision. The District Court described this exception as "a policy that reduces gamesmanship among carriers at the expense of injured parties and insureds." *Id* at 20.

In *Guidant*, remember, the Mississippi Supreme Court held that Guidant was entitled to contribution from INA if Guidant could prove that "it was legally liable to settle" and that the amount paid to the plaintiffs was reasonable. *Guidant Mutual Insurance Company v. Indemnity Insurance Company,* 13 So.3d 1270, 1280 (hereafter *Guidant I*). In *Guidant I,* The Mississippi Supreme Court reversed the Circuit Court of Marshall County, Mississippi and remanded the case. On remand, the Circuit Court Judge for Marshall County granted summary judgment to Guidant on the contribution issue, allowing Guidant to collect contribution from INA. INA appealed and that case of *Indemnity Insurance Co. of North America v. Guidant Mutual Insurance Co*., 99 So.3d 142 (Miss. 2012) (hereafter referred to as *Guidant II*) was decided by the Mississippi Supreme Court.

In *Guidant II,* the Mississippi Supreme Court held that Guidant could recover contribution from the county's carrier, INA, only to the extent that settlement payment exceeded the firefighter's primary coverage limits. In *Guidant II*, the court reiterated its holdings in

previous cases that an insurer must act in the best interest of the insured. *State Farm,* 255 So.2d at 669. An insurer has a duty to protect the interests of its insured, "which includes the duty to settle claims within the policy limits on objectively reasonable terms*." Jordan v U.S. Fid. & Guar. Co.,* 843 F. Supp. 164, 171 (S.D. Miss. 1993) (citing *Hartford Accident & Indemnity Co., v. Foster,* 528 So.2d at 255,282 (Miss. 1988) (in the context of possible excess exposure and the insured's demand that the case be settled within the policy limits, the insurer has a duty to accept an objectively reasonable settlement demand"). In addition to the requirement that an insurer protect the interests of its insured, this Court recognizes that the law and public policy favor the settlement of disputes. *Sneed v. Ford Motor Co*., 735 So.2d 1213, 1215 (Miss. 1999).

The Mississippi Supreme Court, in *Guidant II,* went on to define what was meant by "legally liable to settle" as used in *Guidant I.* Legally liable to settle, the Court said, meant that the insurance company seeking contribution must prove that it had a legal *duty* to settle, or at least a legal duty to consider the insured's best interest and to make an honest evaluation of a settlement offer within the policy limits.

The Court of Appeals for the Fifth Circuit, applying Mississippi law, examined this issue of the voluntary payment doctrine in 2016. In *Southern Insurance Co. v. Affiliated FM Insurance Co*., the court was dealing with what it termed a "years-long stare down between two insurers which covered the same property and risk but for difference insureds…" *Southern Insurance Co. v. Affiliated FM Insurance Co*., 830 F.3d 337, 340 (5th Cir. 2016). Southern Insurance Co. (hereinafter "Southern") provided coverage for the Ogletree House, a building leased from the University of Southern Mississippi by the Alumni Association (hereinafter "association"). The house was also covered under the University's policy with Affiliated FM

Insurance Co., (hereinafter "Affiliated"), which covered multiple buildings under a policy with a blanket limit of $500 million dollars.

When the Ogletree house was damaged by a tornado, Southern refused to pay for repairs to the house, claiming, *inter alia,* that the university and not the alumni association, was obligated to pay for all repairs, as contemplated by the lease. Affiliated paid the university for repair costs for the house. Affiliated stated it was in the best interest of the university for it [Affiliated ]to make payment. Affiliated then reserved the right to pursue recovery of the payments from Southern.

Among the arguments Southern made to the court was that Affiliated could not recover from Southern because Affiliated's payment was "voluntary." The Court of Appeals held that Affiliated's payment to the university was not voluntary "because it was a contractually – obligated payment between insurer and insured." Citing *Guidant I*, the court reiterated that under Mississippi law, a volunteer is "[a] stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay." *Guidant Mutual. Ins. Co. v. Indemnity. Ins. Co. of N. Am.,* 13 So.3d 1270, 1279. Affiliated was obligated under its policy to provide coverage for the house to its insured, the university. Nonpayment under that policy could have exposed Affiliated to potential liability. Affiliated acted pursuant to its duty to pay; thus, it cannot be considered a volunteer. *Guidant*, 13 So.3d at 1279; *State Farm*, 255 So.2d at 669; *see also St. Paul Fire & Marine Ins. Co. v. State Volunteer Mut. Ins. Co.*, No. Civ. A. 2:97CV47-D-B, 1998 WL 173222, at *2 (N.D. Miss. 23 Feb. 1998) (in subrogation context, insurer who was legally obligated to make payments was not a "mere volunteer"), *aff'd* 212 F.3d 595, 2000 WL 423419 (5th Cir. 2000) (unpublished.); and *Gray Properties, LLC v. Utility Constructors, Inc.,* 168 So.3d 1164,1167 (Miss. Ct. App. 2014) (voluntary payor is a stranger or intermeddler with no interest

to protect and no obligation to pay). *Cf. Mississippi Farm Bureau Casualty Insurance Co. v. Amerisure Insurance Co.,* 2013 WL 286364 (S.D. Miss. Jan. 24, 2013) (unpublished) (insurer had no contractual obligation to defend, thus payment was voluntary).

*Colony Insurance Co. v. First Specialty Insurance Corp*. 2017 WL 470902 *4 (S.D. Miss. Feb. 3, 2017) is of interest. The district court held that where the insurer consistently claimed that the purported insured was not covered under its policy, the insurer acted as a voluntary payor in contributing to the settlement and could not recover from the other insurer. The case was appealed to the Fifth Circuit Court of Appeals. *Colony Insurance Co. v. First Specialty Insurance Corp*., 2018 WL 1804670 (5th Cir. April 16, 2018), 726 Fed. Appx. 992 (2018). The federal appellate court, recognizing that the Mississippi Supreme Court had not addressed this issue, certified the question to the Supreme Court of Mississippi. The Fifth Circuit did, though, reiterate that Mississippi's voluntary payment doctrine does not bar an insurer from recovering a settlement payment made under "compulsion" or as a result of a settlement-related "legal duty".[6] At the time of this writing, the Mississippi Supreme Court had not rendered its decision on the matter. *Colony Insurance Co. v. First Specialty Ins. Co.* 2018-FC-00574-SCT. ).

---

[6]The Fifth Circuit Court of Appeals certified two questions to the Mississippi Supreme Court:

1) Does an insurer act under "compulsion" if it takes the legal position that an entity purporting to be its insured is not covered by its policy, but nonetheless pays a settlement demand in good faith to avoid potentially greater liability that could arise from a future coverage determination?

2) Does an insurer satisfy the "legal duty" standard if it makes a settlement payment on behalf of a purported insured whose defense it has assumed in good faith, but whose coverage under the policy has not been definitively resolved, even if the insurer maintains that the purported insured is not actually insured under the policy?

*Colony Insurance Co. v. First Specialty Insurance Corp*., 2018 WL 1804670 *4 (5th Cir. April 16, 2018), 726 Fed. Appx. 992 (2018).

In *Southern v. Affiliated*, the Court discussed some of the cases in which payments were found not to be voluntary.

> Courts analyzing the doctrine have concluded that payments were not voluntary in a variety of circumstances. *See Guidant*, 13 So.3d at 1279–80 (settlement payment on behalf of insured with whom insurer had contractual obligation to defend not voluntary); *State Farm*, 255 So.2d at 669 (co-primary insurer with "solemn obligation" to defend insured and make settlement payments not acting voluntarily); *Travelers Prop. Cas. Co. of Am. v. Federated Rural Elec. Ins. Exch.*, C.A. No. 3:08:CV83–DPJ–JCS, 2009 WL 2900027, at *6 (S.D. Miss. 3 Sept. 2009) (interpreting *Guidant* to "suggest that if the party seeking contribution establishes its duty to pay, it may then seek contribution for the portions of the settlement it paid on the other carrier's behalf", where two insurers "provided coverage for th[e] same risk").

*Id.* at 348.

The insurers in the instant case, including Union, are not strangers to the transaction, and, thus, cannot be considered volunteers under Mississippi law, provided the settlement was within the policy limits and the settlement amount was reasonable. This court now undertakes to determine whether the settlement amount was reasonable.

In *Guidant II*, in evaluating the reasonableness of the settlement, the court noted that Guidant presented ample evidence, through affidavits, correspondence, interrogatories and deposition transcripts, that the settlement amount was reasonable. In that case, the injuries sustained by the plaintiffs were quite serious. Based on the plaintiffs' injuries and medical expenses, lost wages and the blindness to one plaintiff that resulted from the car wreck, a jury verdict could have exceeded the policy limits in that case.

In the case *sub judice*, the plaintiff in the underlying case, Gatlin, sustained extremely serious injuries, and extraordinary medical expenses, including the cost of a double lung transplant, the cost of which was in excess of a half million dollars, such that a jury could have exceeded not only the $1 million that Travelers contends was the maximum aggregate policy

limit covering Custom, but in the opinion of the defense attorneys a jury verdict could have exceeded the 1.75 million dollar settlement amount. Plaintiff's expert report opined that Gatlin's damages were significantly in excess of the $1.75 million settlement amount. According to the estimates of the defense attorneys retained by the insurance companies, the value of the case was between $5 million and $10 million dollars, which would also have exceeded the $4 million amount that Union claims was the maximum aggregate policy limit. Given these undisputed facts, this court is persuaded that the settlement amount was reasonable.

The court must next look to whether the settlement amount of $1.75 million dollars was within policy limits. This court is persuaded that it was, based on the reasons more thoroughly discussed later in this opinion. Therefore, Union's payment was not voluntary, and Union may seek contribution for its overpayment from Travelers.

### B. Breach of contract by Insured

Travelers argues that it is not obligated to indemnify Custom, its insured, because Custom breached its insurance contract with Travelers by settling without Travelers' consent. Travelers' insurance contract includes a "right to defend," clause which stipulates that Travelers has the "right and duty to defend any 'suit' seeking those damages" (referring to bodily injury), and a consent-to-settlement clause stating that "no insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."[7] Travelers asserts that Customs' breach alleviates its liability under the contract. Travelers further states that at the time of settlement, certain strategies had been

---

[7] *Travelers Commercial General Liability Policy* issued to Custom Aggregates & Grinding. [Docket No. 31-2].

unexplored that would have lowered the amount of liability down to the one million dollar mark, rendering the $1.75 million settlement as excessive.

Travelers claims that because it notified all insurers and Custom prior to the settlement that it would only be liable for $485,700, it did not consent to any settlement requiring a higher payment amount. Travelers argues that in the October 4th letter it sent to Custom, copying the other insurers, Travelers stated that it would pay no more than its pro rata share of the policy limits ($485,700), but would continue paying its portion of defense costs and aggressively defend Custom at trial. Travelers also discussed trial strategies and what it considered to be unexplored defenses with Custom's defense attorneys.

*St. Paul Property and Liability Ins. Co. v. Nance,* a Mississippi case, is cited by Travelers to show that settlement without permission of the insurer is a breach of contract, and that Custom settled without its permission, thereby breaching its contract with Travelers and relieving Travelers of its payment obligation. In that case St. Paul's insured, who had been injured in an automobile accident, settled with the tortfeasor (for partial payment of damages) in exchange for release of the tortfeasor's liability. The insured then collected from his own insurer under his uninsured motorist coverage. The Mississippi Supreme Court said in *St. Paul,* the insured's settlement and release of the tortfeasor "is a breach of the insured's contract with its UM [uninsured motorist] carrier, precluding recovery on the UM contract." *Id.,* 577 So.2d 1238, 1242 (Miss. 1991) (citing *United States Fidelity & Guaranty Co. v. Hillman*, 367 So.2d 914 (Miss. 1979). Unlike the instant case, however, the insured in the *St. Paul* case settled with the tortfeasor without ever notifying the insurer or giving the insurer an opportunity to participate in negotiations or settlement. Travelers, in the case *sub judice,* was notified of the settlement negotiations and participated in settlement efforts until shortly before trial.

Additionally, the *St. Paul* case was a subrogation case, not one for contribution. In a subrogation case, the insurer steps into the shoes of the insured, and has no more rights than the insured.  St. Paul was denied recovery because it only had the same rights as the insured, and the insured had already released the tortfeasor. *Id* at 1242.   In the instant case, Union brings this lawsuit based on its own right to contribution. *St. Paul Fire and Marine Ins. Co. v. Nance* is not helpful to Travelers' position.

Travelers also cites two Fifth Circuit cases based on Texas law for the proposition that an insurer may escape liability on the basis of a settlement-without-consent clause.  The first of these is *Motiva Enter., LLC v. St. Paul Fire and Marine Ins. Co., 445 F.3d 381, 386 (5th Cir. 2006).*  The Court there said, it is not clear whether under Texas law, an insurer must demonstrate prejudice before it can avoid its obligations under a policy where the insured breaches a consent-to-settle provision.  In that case, though, the Court found that the insurer did actually suffer prejudice.  In *Motiva,* the insurer was originally involved with settlement negotiations, but was excluded from those negotiations before they were concluded. *Id.,* 445 F.3d 381, 386 (5th Cir. 2006).  The *Motiva* court found that exclusion from the settlement process prejudices the insurer as a matter of law, and allowed the insurer to escape liability for that reason. *Id.,* 445 F.3d at 386.  The same cannot be said in the instant case.  Union was a participant in the negotiations until almost the very last moment, and cannot show how it was prejudiced.

Travelers also cites the Fifth Circuit case of  *Ideal Mut. Ins. Co. v. Myers*, for the principle that an insured is required to cooperate with the insurer and the insured cannot make any agreement which would operate to impose liability upon his insurer or would deprive the insurer of the use of a valid defense. In that case, the insured was the estate of an aircraft pilot

who had been killed in a plane crash. *Id.,* 789 F.2d 1196, 1202 (5th Cir. 1986), The insurer was denying coverage to a passenger who died in the plane crash with the pilot, contending that certain conditions of the policy had been violated. Nevertheless, the pilot's estate settled the wrongful death action that had been brought by the passenger's estate, without obtaining consent to settle from the insured. The *Ideal* Court found that the actions of the pilot's estate in settling with the passenger's estate did <u>not</u> discharge *Ideal* from its obligations under the policy, because the actions in settling the claim did not prejudice the insurance company nor deprive it of any policy defense. This case is not helpful to Traveler's position.

Travelers also references a recent 5th Circuit case based on Louisiana law which cited the *Motiva Enteprises* case, and ruled that the breach of the consent-to-settle clause in an insurance contract caused prejudice to the insurer and relieved the insurer's obligation to pay under the insurance contract. *Danrik Constr. Inc. V. American Casualty Co. of Reading Pa.*, 314 Fed. Appx. 720, 724 (5th Cir. 2009) (not for publication). A construction contractor caused damage on construction projects and requested liability coverage from insurer. Insurer began adjustment process and agreed to pay an amount less than plaintiffs demand for settlement. Contractor settled with plaintiffs without insurer's consent, then sued the insurer for payment. The Court said the *Motiva* case "suggests that whether a court will excuse a breach of a consent-to-settle clause depends on the circumstances of the situation" and in the instant case there was no "time is of the essence" situation that would excuse contractor's settlement without consent. *Id* at 724.

These cases indicate that whether a breach of the consent to settle clause provides a defense against the contract for Travelers hinges on 1) whether Travelers had a meaningful opportunity to participate in the settlement negotiations, 2) if it suffered prejudice based on the

breach, and 3) if exigent circumstances existed that would cause the court to excuse a breach of a consent-to-settle clause by the insured.

It appears from the record that Travelers had a full opportunity to participate in the settlement negotiations.   A reading of the emails between all insurers, Custom and the attorneys, indicates that further pressing of a settlement of $1,000,000 was futile because of the plaintiff's position. Plaintiff had rejected the last offer of $1 million dollars.  The last demand by Plaintiff was for $4 million dollars.  Custom, the attorneys and other insurers also seemed to think a jury trial would yield a much higher judgment against Custom. This seems like settlement negotiations in which Travelers had an opportunity to participate, but its assessment of the settlement value diverged too greatly from all other parties for them to come to an agreement with Travelers. These circumstances weigh in favor of a determination that a Mississippi court would decide that a breach of the consent-to-settle clause, if there was a breach, is excused because of the exigent circumstances.

Union argues that Travelers' consent to settlement was implicit in Travelers' payment of almost half a million dollars toward the settlement.   Union also contends that despite Travelers eleventh-hour withdrawal from the settlement negotiations, Travelers had led Custom and the other insurers to believe it would participate by explicitly pursuing a $1,500,000 settlement authorization.  After Travelers stated it would only pay $485,700, Custom and the other insurers continued to copy Travelers on emails concerning the progression of the settlement negotiations. Finally, Union argues that the very short time to trial and the attorneys' high valuation of the claim if it went to a jury, obligated Union to put the insured's best interest above its own and settle the case. (Custom's defense attorneys at Forman, Perry, Watkins Krutz & Tardy valued the claim at between $5,000,000 to $10,000,000.)

This court finds that the alleged breach of contract by Custom is not a defense to Travelers' contribution to Union. This is a defense that could, arguably, be asserted as a basis for failing to indemnify Custom, but Travelers makes no claim here against its insured. If Travelers really thought it could escape liability because of the failure of the insured to obtain consent, it would have refused to pay any amount toward the settlement, or would seek contribution from its insured. This, Travelers has not done.

### C. Combined Policy Limits

Key to Travelers' position is the assertion that the maximum liability owed under all of the policies combined was only one million dollars. Travelers contends that Gatlin's injuries constitute only a single occurrence, and the policies each have a per occurrence limit of $1 million dollars. This issue is more thoroughly discussed in this court's analysis of Union's motion for summary judgment.

This court is not persuaded to grant Traveler's motion for summary judgment. As previously discussed, Union's payment was not a 'voluntary payment' as Travelers contends; and Union is entitled to seek contribution from Travelers for its overpayment, provided the $1.75 million dollar settlement amount was reasonable and within policy limits. This court has already determined that the settlement amount was reasonable. The only remaining inquiry, therefore, is whether the settlement amount was within policy limits. This will be more thoroughly examined in this court's analysis of Unions motion for summary judgment.

### I.     UNION'S MOTION FOR SUMMARY JUDGMENT

### A.  Voluntary Payment Doctrine and Agreement to Litigate

Union has also filed a motion for summary judgment [Docket No. 33], basing its request for judgment as a matter of law on many of the same arguments that are outlined in Travelers'

motion for summary judgment, but urging different conclusions. First, Union argues that the voluntary payment doctrine does not apply to its payment.

Union correctly argues that Mississippi recognizes that one insurance carrier, like Union, which overpays its portion of a settlement in order to protect a mutual insured, like Custom, can seek contribution from the underpaying carrier. Union cites *Guidant v. Mutual Ins. Co. v. Indemnity Ins. Co. of North America,* 13 so.3d 1270 (Miss. 2009) and *State Farm v. Allstate,* 255 So.2d 667 (Miss. 1971). Union submits that the overpayment to the Gatlin Settlement was not voluntary, because, consistent with the requirements of *Guidant* and its progeny, Union was legally obligated to overpay to protect its insured. This court agrees.

With the very real possibility that a huge judgment could be rendered against their insured, and with the trial only a few days away, Union perceived an obligation to protect its insured from a judgment in excess of policy limits. Ironically, Union's actions in funding the settlement above its pro rata share, also protected Travelers from a potential "bad faith" claim. This court previously has determined that Union's payment was not voluntary, based on the factors outlined in *Guidant. v. Indemnity*, 13 So.3d 1270 (Miss. 2009) (*Guidant I),* and *Indemnity v. Guidant*, 99 So.3d 142 (Miss. 2012), (*Guidant II).*

Union argues that this court should not look to *Genesis* to define voluntary payment; but, says Union, even under the criteria of *Genesis,* the excess payment it made was not voluntary, because there was an agreement by the carriers to litigate their respective liabilities after the settlement. As previously discussed, two factors are to be considered under the *Genesis* test to determine whether a payment was voluntary: 1) that no prior agreement existed between the parties to litigate coverage following settlement (e.g., parties agree that one will pay, but they

reserve the right to resolve coverage issues later); and 2) payments must be voluntary, that is, not made by virtue of legal obligation, by accident/mistake or made under compulsion. *Id* at 738.

In the *Genesis* case, the court said, that a mutual agreement between President, Wausau, and Genesis to litigate their respective liabilities among themselves after settling the Baker litigation would preclude the application of the volunteer payment doctrine. *See McLean,* 157 So. at 362. *Accord McDaniel Bros. Constr. Co.,* 175 So.2d at 605; *Presley,* 116 So.2d at 416. Genesis contended that its reservation of rights letter, combined with Wausau's internal e-mails, indicated the presence of such an agreement.

The district court, in *Genesis,* had concluded that the settlement with Baker took place "in lieu" of a legal determination of the parties' respective obligations under their policies. The court premised its decision upon the legal rule that a payment under "protest" or accompanied by a unilateral reservation of rights will not escape the application of the volunteer doctrine. *See Rowe v. Union Central Life Ins. Co.,* 194 Miss. 328, 12 So.2d 431, 433 (1943); *Horne v. Time Warner Operations, Inc.,* 119 F.Supp.2d 624, 629 (S.D.Miss.1999).

The court in that case determined that the appellants had raised a fact issue as to whether Genesis's reservation of rights was indeed unilateral or whether Wausau had agreed with President and Genesis to preserve the coverage issue for resolution at a later date. *Genesis Ins. Co. v. Wausau Ins. Companies*, 343 F.3d 733, 736–37 (5th Cir. 2003)

Union contends that in the instant case, an agreement existed to litigate the respective rights and liabilities of the insurers after the settlement was paid, which would obviate the voluntary nature of Union's overpayment. Travelers counters that it did not have any such agreement with the other insurers to litigate coverage issues after settlement. It claims that any

correspondence regarding resolving the dispute among the insurers after the settlement was paid was unilateral, and not by agreement.

Union says that on the same day as the settlement agreement was announced, October 9, 2007, counsel for Travelers, Gerald Begley, sent an email to the other carriers stating the figure Travelers would pay and acknowledging that the carriers "*have reserved their rights to any contribution claims to which they believe they may be entitled. ….*" [doc. No. 47 p. 39]. Two days later, on October 11, 2007, a representative from Union emailed a letter to Gerald Begley notifying Travelers that Union and Zurich had agreed to fund the balance of Travelers' share but that both companies intended to seek reimbursement from Travelers. Then on October 15, 2007, counsel for Union, Stephen Wright, sent an email to Begley at Travelers, purporting to memorialize their earlier telephone conversation. The text of that email appears below.

> Gerald:
>
> Thank you for the telephone conversation of 10-15-07. This email will confirm our mutual understandings from that communication. We agreed: 1) Travelers, though it may pay $480+/-K toward the $1.75 Million to settle the Gatlin litigation for insured Custom Aggregates, will not expect or require releases from the insured or the other insurers, including USIC; 2) Travelers will negotiate now and after settlement relative to it paying more of the settlement funds; and 3) if satisfactory resolution of this issue (Travelers contractual share of the Indemnification funding) cannot be reached by agreement, then Travelers agrees to litigate with USIC and the other carriers post settlement to allow the courts to resolve the issue. With this understanding in place, no payment by USIC or other carriers can be characterized as voluntary.
>
> Let me know if I misstate our conclusions and agreement.

[doc. no. 48 p. 31]

Begley responded three days later, acknowledging receipt of the October 15, email as well as two subsequent emails from Wright, and reiterated Travelers' position regarding the $1 million dollar total limit of liability and raising a question about the reasonableness of the

settlement amount.  Regarding the agreement to negotiate after settlement, Begley says:

"Finally, while Travelers believes its position with respect to the occurrence limit is correct, we remain open to discussion on this matter."  He does not dispute Wright's characterization of their earlier conversation regarding negotiation or litigation.[doc. no. 48 p.32].  Thus, it appears that there was an agreement to resolve the respective rights of the insurers after settlement.  This is but another nail in the coffin of the voluntariness that Travelers contends applies to Union's overpayment.

### B. The Coverage Trigger: exposure v. manifestation of symptoms

In its Complaint Union asks this court to decide as a matter of law whether to apply the 'exposure' or the 'manifestation of symptoms' triggering mechanism to determine which policy years are involved.  "Trigger of coverage" is a term of art that describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy." *Boston Gas Co. v. Century Indemnity Co.,* 454 Mass. 337, 350, 910, N.E.2d 290, 301 (2009).

Most liability policies are designed to respond to losses that occur instantaneously, such as automobile accidents.  In toxic exposure cases, however, the damage usually cannot be traced to having "occurred' at a specific point in time, but instead developed and existed continuously, remaining unrecognized, for several years before it was discovered.  The damage may have "occurred" or been "triggered" along a continuous timeline during which several successive polices were in effect.  See William R. Hickman and Mary R. De Young, *Allocation of Environmental Cleanup Liability Between Successive Insurers,* 17 N.Ky.L.Rev. 291, 293 (1990).

The "exposure theory," provides that coverage of toxic tort claims should be based solely on the claimant's period of exposure to the toxic substance. If the exposure occurs during the

policy period of more than one carrier, the coverage and defense obligations would be shared among the carriers on the risk during any period of exposure, usually on an apportioned *pro rata* basis. The exposure theory grew out of asbestos cases in which proponents said medical evidence showed that bodily injury takes place at or shortly after exposure to asbestos and that the condition worsens with the continued breathing in of the dangerous substance. Therefore, they say, coverage and defense obligations must be tied to exposure. *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.,* 145 Ill. App. 3d 175, 494 N.E.2d 634 (1986), aff'd sub nom. *Zurich Ins. Co. v. Raymark Indus., Inc.,* 118 Ill. 2d 23, 514 N.E.2d 150 (1987)

The exposure theory was first adopted by the Court of Appeals for the Sixth Circuit in *Insurance Co. of North America v. Forty-Eight Insulations,* 633 F.2d 1212 (6th Cir.1980), *clarified,* 657 F.2d 814, *cert. denied* (1981), 455 U.S. 1099, 102 S.Ct. 1648, 71 L.Ed.2d 878, It was later was utilized by the Court of Appeals for the Fifth Circuit in *Porter v. American Optical Corp.* (5th Cir.1981), 641 F.2d 1128, cert. denied (1981), 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650. The Eleventh Circuit has adopted this approach (*Commercial Union Insurance Co. v. Sepco Corp.* 765 F.2d 1543 (11th Cir.1985)), as have many states.

Under the "manifestation theory", coverage and defense obligations are not triggered until the occurrence insured against has "manifested" itself in a medically detectable manner. The proponents of this theory contend that medical evidence shows that diseases such as asbestosis[8] are not diagnosable until the person has developed recognizable signs or symptoms. *Zurich* at 181-83.

---

[8] Asbestosis, like silicosis, is a continuous exposure toxic tort and much of the early litigation surrounding these issues concerned asbestos exposure. Many of the cases that inform courts' decisions today are asbestos cases.

The manifestation theory has been adopted by the First Circuit.  *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.* (1st Cir.1982), 682 F.2d 12, *cert. denied* (1983), 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500.)

Union proposes that for a continuous exposure toxic tort the court should adopt an 'exposure' coverage trigger as a matter of law.  Mississippi, says Union, has not adjudicated which coverage trigger applies and thus the District Court should make an *Erie* guess as to which trigger applies.

The parties, however, prior to the underlying litigation, accepted the 'exposure' method to determine which policies were involved.  Furthermore, each insurer followed this agreement in calculating which portion of defense costs they paid. This issue, therefore, is not in dispute in the instant case, and therefore, there is no issue in controversy for this court to decide concerning this matter.

### C.  Allocation of Indemnity: pro rata allocation v. all sums method

Once it is determined which policy years and which policies are implicated, the next logical step is to determine the allocation of the risk between the successive insurers.  Union asks in its Complaint that this court establish the allocation method that should be used to determine each insurer's liability.  In progressive or continuous injury situations, it is impractical or impossible to determine how much of the damage actually took place during a respective policy period; thus the courts generally take one of two major approaches to the allocation issue.

One approach is often referred to as the "joint and several" or "all sums" method. Under this method, any policy on the risk for any portion of the period in which the insured sustained bodily injury is "jointly and severally obligated to respond in full, up to its policy limits, for the loss" *Boston Gas Co. v. Century Indemnity Co.,* 454 Mass. 337, 351, 910, N.E.2d 290, 302

(2009) (quoting Jones, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl L.J. 25, 37-38 (1999)).  The insured selects the policy it wants to use, usually the policy with the highest limit. The benefit to the insured under the "all sums" method is that the insured only has to deal with one insurance company.  It is up to the selected insurer to seek any contribution from any other triggered polices.  The disadvantage of this method to the insured is that the total indemnity available under this approach is the indemnity limit for the single policy chosen.

Union advocates a pro rata allocation method.  Courts adopting this method allocate a portion of the total loss to each policy that is triggered over the entire continuous injury spectrum,[9] using a variety of formulas.  Recognizing that part of a long-tail[10] injury will occur outside any given policy period, courts utilizing pro rata allocation are attempting to "produce equity across time."  *Boston Gas*, 454 Mass. at 353, 910 N.E.2d at 303 (2009).  The seminal case adopting the pro rata allocation method is *Insurance Co. of North America v. Forty-Eight Insulations, Inc*., 633 F.2d 1212 (6th Cir. 1980).

In the instant case, Custom's insurers entered into an agreement to utilize a 'pro rata' allocation model, based on the years each insurer was 'on the risk' (the period of time each insurer covered Custom). The insurers agreed to and did prorate their liability based on the ratio of their years of coverage to the total number of years triggered by exposure. This issue then, has

---

[9] Under the pro rata allocation method, generally, the insured is liable for costs attributable to losses occurring during periods when it was uninsured. *Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co*., 826 A.2d at 116-17 (quoting *Owens-Illinois, Inc., v. United Ins. Co.* 139 N.J. 437,467, 650 A.2d 974 (1994));

[10] A long-tail injury is a series of indivisible injuries attributable to continuing events and which produce progressive damage that takes place slowly, usually over years and across multiple policy periods, often not becoming manifest until long after initial exposure.  The term is applied to injuries caused by environmental damage and toxic exposure, such as asbestosis and silicosis. *Montrose Chemical Corporation of California v. Superior Court*, 14 Cal. App. 5th 1306, 1322–23, 222 Cal. Rptr. 3d 748, 759 (Ct. App. 2017), *as modified* (Sept. 8, 2017); *Boston Gas Co. v. Century Indemnity Co.,* 454 Mass. 337, 351, 910, N.E.2d 290, 302 (2009).

also been agreed to by the parties, for purposes of the Gatlin litigation against Custom; thus, there is no controversy for this court to decide concerning this matter.

### D. Indemnity Limit

The key issue disputed between the parties is the indemnity limit for the total combined policies of all insurers for the period of exposure. Travelers contends this amount is $1 million dollars. Union contends this amount is at least $4 million dollars. If Travelers is correct, it owes nothing to Union, because its pro rata share of $1 million dollars has been paid. If Union is correct on this point, Travelers must reimburse Union the $291,450 that Union seeks by way of contribution.

Contrary to the parties' requests, however, the issue to be decided is not whether the maximum aggregate liability is $1 million dollars or $4 million dollars. The inquiry this court must make is whether the maximum aggregate liability is at least $1.75 million dollars; that is, whether the $1.75 million dollar settlement amount was within policy limits.

This question has to be answered in order to determine the amount toward which Travelers was required to pay 48.57%. Asked differently, was Travelers responsible for paying 48.57% of the $1.75-million-dollar settlement amount? If so, Travelers' share would have amounted to $849,975.00, and Union is entitled to summary judgment in its favor. Alternatively, has Travelers paid all it owes because the settlement amount exceeded policy limits, in which case Travelers' motion for summary judgment should be granted?

### a. One Million Dollar Combined Policy Limit

There are at least three positions outlined by the briefs of the parties on this issue. The first is Traveler's position that all carriers together jointly owed only a single occurrence limit, or $1 million indemnity to Custom. This is hard to reconcile, however, since the parties agreed

that this continuous exposure toxic tort transpired over 104 months and that it triggered nine consecutive primary liability policies.   Each of those triggered policies had a single occurrence limit of $1 million dollars; yet Travelers contends only one such limit is shared by all insurers, limiting coverage to only $1 million dollars total available to Custom.

Travelers cites cases in support of its position, but those cases have little relevance here. Those cases did not arise in the context of a progressive disease or continuing tort, such as what this court is dealing with here.   As the Court stated in *Forty-Eight Insulations*, "[a] cumulative, progressive disease does not fit the disease or accident situation which the policies typically cover." *Id*. at 1222

### b.  Nine Million Dollar Combined Policy Limit

Some courts have applied a form of "horizontal stacking"[11] to the various policies implicated when exposure to a toxic tort spans across several years and several policies. The maximum combined liability is arrived at by 'stacking', or adding, the single occurrence limits of each of the policies, which are triggered by the continuous exposure toxic tort.   In the instant case, the nine consecutive policies with $1 million dollar occurrence limits would result in indemnity coverage of nine million dollars.

Several states have seemingly adopted this approach, including California, Pennsylvania and Maryland.   In *State of California v. Continental Insurance Co.,* 55 Cal.4th at p. 196, 145 Cal.Rptr.3d 1, 281 P.3d 1000) (Cal. 2012), the Supreme Court of California held that where an ongoing environmental injury triggers multiple policies across many policy years, the insured may "stack" the policies across policy periods to create a coverage limit equal to the sum of all

---

[11] "Stacking refers to the concept of taking policy limits form multiple, but not overlapping, policies potentially covering the same lawsuit and adding those limits together".  *North American Specialty Insurance Co. v. Royal Surplus Lines Insurance Co.* 541 F.3d 552,556 (5ᵗʰ Cir. 2008).  *Am Physicians Ins. Exchange v. Garcia,* 876 S.W.2d 842, 854-55 (Tex. 1994).

purchased insurance policies.  See also *Montrose Chemical Corporation of California v. Superior Court*, 14 Cal. App. 5th 1306, 1322–23, 222 Cal. Rptr. 3d 748, 759 (Ct. App. 2017), *as modified* (Sept. 8, 2017).  In *Montrose*, The California Court of Appeals discussed 'long-tail' injuries, calling them "a series of indivisible injuries attributable to continuing events without a single unambiguous 'cause' [which] produce progressive damage that takes place slowly over years or even decades*." Id*., (citing *Continental*, *supra*, 55 Cal.4th at p. 196, 145 Cal.Rptr.3d 1, 281 P.3d 1000.)  The 'all sums'[12] and 'stacking' methods, the California Supreme Court said, acknowledge the uniquely progressive nature of long-tail injuries that cause progressive damage throughout *multiple* policy periods. *Id. at 1008-09.*

The Supreme Court of Pennsylvania, in *J.H. France Refractories Co. v. Allstate Ins. Co.,* 626 A.2d 502, 509 (1993)  adopted the "all sums" allocation method and serial 'stacking' of policies for continuous bodily injuries caused by an asbestos manufacturer. *Id*. at 509.  See also *Koppers Co. v. Aetna Cas. & Surety Co.,* 98 F.3d 1440 (3d Cir. 1996) (adopting 'all sums' and 'stacking' for environmental cleanup liability). The United States Court of Appeals for the Third Circuit, applying Pennsylvania law, concluded that "[a]s with asbestos related bodily injury, environmental property damage is a progressive harm that, as practical matter, is indivisible." *Koppers* at 1450. See.e.g., *New Castle County v. Continental Casualty Co*.,  725 F. Supp. 800, 811-12 (D. Del. 1989) (concluding "it would be impossible in this case to determine when the first molecule of contaminant damaged neighboring property, or at what rate the contamination

---

[12] If the insured contracted with several different insurers over the period of a victim's exposure to a toxic substance, and several insurers are obligated to indemnify the insured, courts generally adopt either a pro rata method or an "all sums" method to allocate losses among insurers.  The "all sums" approach is a theory of joint and several liability.  *See, e.g., Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 12 Envtl. L. Rep. 20105 (D.C. Cir. 1981).  Any policy on the risk for any part of the period in which the insured sustained injury, is jointly and severally obligated to respond in full up to its policy limits for the loss. *Boston Gas Co. v. Century Indemnity, Co.,* 454 Mass. 337,351, 910 N.E.2d 290 (2009).

spread."). *See also Maryland Cas. Co. v. Hanson*, 169 Md. App. 484, 902 A.2d 152 (2006) quoting *Riley v. United Services Auto. Ass'n,* 161 Md. App. 573, 871 A.2d 599 (2005), judgment aff'd, 393 Md. 55, 899 A.2d 819 (2006) ("[W]hile any one policy would pay no more than $300,000 per occurrence, a continuing injury may trigger sequential policies, stacking each of the policies' liability caps").

The horizontal stacking approach would add together the limits of all nine policies that were in effect across the nine years of exposure to establish an indemnity limit of nine million dollars. This would obligate Travelers to indemnify Custom for up to four million dollars, which represents the $1 million dollar limit for each of the four years of coverage Travelers provided to Custom over the exposure period. Under this approach, the 1.75 million dollar settlement amount was well within the combined policy limits of all the carriers and within the indemnity limit for Travelers. Under this scenario, Travelers would owe contribution to Union for $291,450, the amount Union paid toward the settlement on Travelers' behalf. Union also asks for interest.

Not so surprisingly, however, neither party advocates for this approach, as it would establish the highest indemnity limits for the insurers of all the theories advanced.

### c. Four Million Dollar Combined Policy Limit

The third position is that advocated by Union on the limits of liability issue. Union calls this approach a "compromise" between what it terms Travelers' "frugal" position (with a combined indemnity limit of $1 million dollars), and the horizontal stacking position (with a combined indemnity limit of $9 million dollars). This approach would create a combined maximum limit of $4 million dollars available to Custom under the policies for the Gatlin litigation.

Union relies on the language of the landmark toxic tort case decided by the United States Court of Appeals for the Sixth Circuit, *Ins. Company of North America v. Forty-Eight Insulations, Inc*., 633 F.2d 1212 (6th Cir. 1980). This was an early asbestosis case, in which Forty-Eight Insulations, a manufacturer of asbestos products was facing huge potential liability because of numerous lawsuits filed by workers and consumers around the country who had inhaled asbestos fibers and developed lung cancer, asbestosis, and other serious illnesses. The company had purchased products liability insurance from five different companies over a twenty-year period, and for a period before 1955, was self-insured or without other insurance. The Court was faced with deciding which insurance companies were obligated to provide a defense and, in the event of judgment, which would be responsible for paying that judgment.

The appellate court, in *Forty-Eight Insulations,* made two important decisions relative to long term toxic torts: 1) that bodily injury occurs at the time of exposure to a toxin, thus implicating and any and all insurers providing coverage during the exposure period; and 2) that the pro rata method is used to allocate liability, proportionate to the length of each insurer's coverage during the period of exposure, or "time on the risk."

The Sixth Circuit did not address indemnity limits in the body of the opinion; in a footnote, however, the Court acknowledged that stacking created problems combined with the exposure theory. The combined aggregate limits of the twelve polices at issue in *Forty-Eight Insulations* totaled $5.6 million dollars. The Court stated: "The problem is that if inhalation of each asbestos fiber is deemed to be a separate "bodily injury," this results in the "stacking" of liability coverage to produce coverage that is many times $5.6 million." *Id.* at fn. 28. This, the Court continued, "amounts to giving Forty-Eight much more insurance than it paid for." *Id*. at fn. 28.

The appellate court agreed with the district court's decision that stacking of liability coverage should be limited. The appellate court also endorsed the district court's statement that "no insurer should be liable in any one case to indemnify Forty-Eight for judgment liability for more than the highest single yearly limit in a policy that existed during the period of the claimant's exposure for which judgment was obtained". 451 F. Supp. at 1243." *Id.* at fn. 28.

The Sixth Circuit Court of Appeals also stated the following in footnote 28:

> The initial exposure to asbestos fibers in any given year triggers coverage. However, under the terms of the policies, additional exposure to asbestos fibers is treated as arising out of the same occurrence. Thus, on its face, the liability of each insurer is limited to maximum amount "per occurrence" provided by each policy. We have no problem with the district court's extending the policy language so that each insurer would face *no more liability per claim than the maximum limit it wrote during any applicable year of coverage*.

*INA v. Forty-Eight Insulations, Inc*., 633 F.2d 1212 fn. 28 (6th Cir. 1980). (Emphasis added).

Travelers, though disagreeing with Union's interpretation of *Forty Eight Insulations,* has labeled this approach "stacking by insurer".  Under this theory, in the case *sub judice,* each of the carriers that insured Custom would owe indemnity limits of no more than one occurrence limit "per carrier."  Having insured Custom for approximately four years of the exposure period, for "$1 million dollars for each of those years, Travelers would owe any amount up to one million dollars in indemnity limits toward the Gatlin settlement.  Union, having insured Custom for only two years of the exposure period at $1million dollars per year, would likewise, owe up to a maximum of $1 million dollars in indemnity limits toward the Gatlin settlement. Similarly, the other two insurers, Kemper and Zurich, would each owe up to a $1 million dollar limit, regardless of how many years each insured Custom.

This approach has some inequities built into it. Under this scenario, it matters not how long the insurer was on the risk; its entire combined policy period would be considered but a

single occurrence, and that insurer would only be liable for the equivalent of one years' policy limit. This seems unfair to those insurers who were only on the risk for a short period of time. For example, an insurer who was on the risk for one out of twenty years of exposure would have the same indemnity limit as an insurer who was on the risk for nineteen of the twenty years of exposure. It could also be quite unfair to the insured. If an insured contracted with the same insurer for each of twenty consecutive years, and bought a $1 million dollar policy each year, $1 million dollars would be all the coverage available to that insured, even though potential plaintiffs were sustaining "continuous or repeated exposure" to harmful conditions across that entire twenty-year period. The insured's coverage would depend on how many carriers from which the insured bought policies, and not how much insurance was purchased.

### d. Comparison of the Approaches

The following represents the indemnity limits for the two insurers that are party to this suit under each of the three methods under discussion.

| Insurance Carrier | Years of Coverage | Policy limit/yr | Indemnity Limit Travelers' Approach | Indemnity Limit Union's Approach | Indemnity Limit Horizontal stacking |
|---|---|---|---|---|---|
| Travelers | four | $1 million | $485,700.00 | $1 million | $4 million |
| Union | two | $1 million | $228,600.00 | $1 million | $2 million |
| Aggregate | nine | $1 million ea. | $1 million | $4 million | $9 million |

If this court accepts Travelers' theory regarding the indemnity limit, Travelers did not underpay for its portion of the settlement. Under Traveler's theory, the indemnity limit for all carriers combined was only $1 million dollars, and any amounts paid above that were voluntary payments, because neither Union nor any other insurer was legally obligated or legally liable to pay that. Under the *Guidant* ruling, a payment is voluntary if it is not within policy limits, or the payor is otherwise not legally obligated to pay.

Under either of the other two theories, the settlement amount was within policy limits and Travelers owes contribution to Union for what Union overpaid. Both of the other approaches involve some degree of 'stacking' of coverage. Without any stacking, the policies do not provide the insured with the amount of insurance paid for. Custom paid for nine separate $1 million dollar policies, and according to these very insurers, Gatlin suffered injury in each of those years, based on their adoption of the exposure trigger. Yet, Travelers would only indemnify Custom for the limit of one policy, or for one occurrence

The effect, under the Travelers theory, is as if there was only one long, nine-year policy and Gatlin's injury was only one 'occurrence' for that entire nine-year period. In that case, according to Travelers' position, Custom would be limited to the $1 million dollar "per occurrence" limit under the policy for the Gatlin lawsuit. While the insured is capped at the $1 million dollar limit for one occurrence and facing potential excess judgments, the four insurers are able to diffuse their liability, paying only a prorated share each of that $1 million limit. This hardly seems to provide to Custom the protection for which it paid.

In *IMO Industries v. Transamerica Corp.*, the New Jersey Superior court was faced with an insurer who had issued a multi-year policy. Like Travelers in the case *sub judice*, the insurer in the *IMO* case posited that the progressive injury should be treated as only one occurrence for the entire multi-year policy period; thus the insured would only be entitled to a one-time maximum "per-occurrence" amount. *Id.,* 437 N.J. Super. 577, 614-15 (2014). The New Jersey court rejected that theory, saying, "[i]n a case of progressive indivisible injury, courts may reasonably treat the progressive injury "as an occurrence within each of the years of a multi-year policy." *IMO Industries, Inc. v. Transamerica Corp*., 437 N.J. Super. 577, 614-15 (2014).

Even in the face of a multi-year policy, the New Jersey court held, in *IMO, supra*, that each year of the policy established a new occurrence. IMO Industries, an insured in that case, did not dispute that the plain language of the policies would impose per-occurrence limits on a term basis rather than an annual basis. IMO Industries, however, advocated that for asbestos cases, every year of a multi-year policy should be treated as if a separate annual limit is available. The court agreed; the court allowed stacking by years even though there was only one insurer. In the instant case, Custom purchased nine annual policies, and a strong argument can be made that it is entitled to the benefit of its bargain.

Some degree of stacking comes closer to giving Custom what it paid for, and still allows the carriers to distribute the liability among the insurers, proportionately. All courts dealing with the long-tail progressive injuries recognize that these are difficult issues, and most general liability policies do not adequately provide for how to deal with them. As courts and commenters have stated, 'stacking' is an attempt to provide equity over time. See *Boston Gas Co. v. Century Indemnity Co.,* 454 Mass. 337, 351, 910, N.E.2d 290, 302 (2009) (quoting Jones, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl L.J. 25, 37-38 (1999)). It would certainly seem to be a more equitable outcome than what Travelers proposes.

In *Forty-Eight Insulations, supra,* the Court expressed concerns that, because under the "exposure' trigger, each breath of asbestos was a separate bodily injury, stacking could conceivably result in almost infinite bodily injuries, resulting in multiplying coverage many times over. That Court's suggestion, that the indemnity for each insurer could be limited to the policy limit for one year, was in response to that concern. The Sixth Circuit Court of Appeals, however, did not rule that the indemnity limit should be so interpreted; it merely stated in a

footnote, that it had no problem with the district court choosing to deal with the issue by limiting each insurer's liability per claim to the maximum limit it wrote during any applicable year of coverage. *INA v. Forty-Eight Insulations, Inc*., 633 F.2d 1212 fn. 28 (6th Cir. 1980).

Infinite liability exposure has not been an issue, however, where courts have utilized the horizontal stacking approach. These courts focus on the "occurrence" term of the contracts of insurance and treat the entire year's exposure as one occurrence, thereby limiting the indemnity for any claimant to the yearly maximum amount under the policy for each year of his or her exposure. The Supreme Court of New Jersey explained it thusly.

> [W]hen progressive individual injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a [Comprehensive General Liability] policy.

*Benjamin Moore & Co. v. Aetna Cas. & Surety Co.,* 179 N.J. 87, 98 (2004) (quoting *Owens-Illinois, Inc. v. United Insurance Co.,* 138 N.J. at 478, 650 A.2d 974. In other words, the court continued, progressive environmental injury is an occurrence in each policy year, thus triggering all relevant policies in effect during the period. See also, *IMO Industries, Inc. v. Transamerica Corp.*, 437 N.J. Super. 57, 614-15 (2014) (courts may reasonably treat the progressive injury "as an occurrence within each of the years of a multi-year policy).

Louisiana has adopted this approach. In *Houston v. Avondale Shipyards, Inc*., the court stated, "we view plaintiff's exposure as an occurrence which occurs (or reoccurs) each year of plaintiff's exposure. Arguably, plaintiff is reinjured each time he inhales silica dust. To avoid infinite liability exposure, however, the factual construction of a single injury (or reinjury) each year is adopted." *Id.* at 150. *Houston v. Avondale Shipyards, Inc.,* 506 So. 2d 149, 150 (La. Ct. App.), *writ denied sub nom. Houston v. Avondale-Shipyards, Inc.,* 512 So. 2d 459 (La. 1987), and <u>writ denied,</u> 512 So. 2d 460 (La. 1987), and *writ denied sub nom. Houston v. Avondale-*

*Shipyards, Inc.,* 512 So. 2d 460 (La. 1987). See also, *Cole v. Celotex Corp.,* 599 So.2d 1058, 1074-80 (La. 1992) (the insurer's liability under the policies shall be determined on a yearly basis and the insurer is at risk for each policy period during which time that plaintiff was exposed). See also, *Ducre v. Mine Safety Appliances Co.,* 645 F. Supp. 708, 713 (E.D. La. 1986) aff'd 833 F.2d 588 (5th Cir. 1987) (insurer issued six separate contracts of insurance to employer, for which employer paid six separate premiums, an additional reason for holding that the insurer is on the risk for each of the six separate contracts of insurance issued).

New Hampshire and Minnesota have also adopted this approach. In *Energy North Natural Gas, Inc. v. Certain Underwriters at Lloyd's,* the New Hampshire Supreme Court stated the long-tail environmental exposure injury is treated as *one occurrence per year* triggering all applicable policies. *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's,* 156 N.H. 333, 934 A.2d 517, 526 (2007) (emphasis added). Environmental cases, like toxic tort cases, create special problems for litigants and courts. Environmental cases involve very high financial stakes, and the claims involve long-tail injuries, spanning several policy periods. *Id.*; see also *Insurance Coverage for Environmental and Toxic Tort Claims,* 17 Wm. Mitchell L. Rev. 945 (Fall 1991); *Northern States Power Co. v. Fidelity Cas. & Co. of New York*, 523 N.W.2d 657 (Minn.1994) (there is only one occurrence during each policy period for purposes of policy limits and deductibles).

Using the approach described in these cases, stacking would create no higher policy limit than the total of the annual limits added together across the total exposure period. In the case *sub judice*, stacking the nine annual policies would create an indemnity limit of $ 9 million dollars. In the example used *in Forty-Eight Insulations,* the annual policy limits totaled $ 5.6 million dollars when added together. Limiting each occurrence to one per year, would result in an

aggregate limit of only 5.6 million dollars, not that amount "many times over" as feared by that Court.

This court is persuaded that Travelers' position is not correct. The indemnity limit is not $1 million dollars as Travelers asserts. The approach Travelers advocates is not consistent with the law or the equities involved.

        e.      **The Contract**

As all of the approaches have some merit and some flaws, this court must look first to the language of the policies at issue. See *Crossman Communities v. Harleysville Mutual Ins. Co*., 717 S.E.2d 589,595 (S.C. 2011). The Travelers policy contains the following language:

1. Insuring Agreement.

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:
>> (1)The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III; and
>> (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

*Travelers' Insurance Policy* [doc. no. 31-2 at p. 9].

Section III referenced in the insuring agreement states as follows:

> SECTION III—LIMITS OF INSURANCE
> ...
> 5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
> a. Damages under Coverage A; and
> b. Medical Expenses under Coverage C
> because of all "bodily injury" and "property damage" arising out of any one "occurrence."

*Travelers' Insurance Policy* [doc. no. 31-2 at p.14].

The Travelers policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at p. 18. The Declarations page of the policy states that the "each occurrence limit" is $1,000,000.00. *Id.* at p. 4. "Bodily injury" according to the policy, "means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at p. 17.

Travelers, according to the above terms of its policy, commits to pay up to $1 million dollars for bodily injury arising out of a single occurrence, not an amount up to $485,700.00. The insurers agreed that the plaintiff in the Gatlin litigation suffered exposure across the nine-year period. Gatlin, therefore, had at least one occurrence during the time that Travelers insured Custom. As stated previously, no other insurer was on the risk during this same period that Travelers insured Custom. Travelers would be obligated to indemnify Custom for up to $1mllion dollars.

The policy language also includes a statement under Section III -- Limits of Insurance that "[t]he limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations..." *Travelers' Insurance Policy* [doc. no. 31-2 at p.14]. It seems then, that the policy terms require that for each new policy year, the coverage starts over and another "occurrence" creates another obligation to pay up to $1 million dollars. The policy language only purports to limit liability under each particular annual policy. Thus, even if there is only one occurrence, the insured should be entitled to recover up to the "each occurrence limit" of that particular policy. That "each occurrence limit" is $1 million dollars according to the terms of the policy. Based on the language of the policy, this court does not agree with

Travelers that the indemnity limit for Custom relative to the Gatlin litigation was only $1 million dollars from all insurers combined

Some courts, using the exposure theory, have found that if there was any exposure during a policy year, the entire exposure for that policy period constitutes but "one occurrence." In the instant case, Gatlin's exposure spanned approximately nine years. If all nine policies are implicated without any limitations, the indemnity limit would be $9 million dollars, and the $1.75 million dollar settlement amount is certainly within policy limits. In that event, summary judgment should be granted in favor of Union. If the court chose to apply the "per carrier" limitation mentioned in the Forty-*Eight Insulations* footnote, as advocated by Union, the indemnity limit would be $4 million dollars, and the $1.75 million dollar settlement amount is well within policy limits.

This court, however, need not decide between the two theories and determine whether $4 million dollars or $9 million dollars is the total indemnity limit for all carriers combined. For all the reasons stated, this court is persuaded that $1 million dollars is <u>not</u> the indemnity limit, and that limit is at least $4 million dollars, based on the theories of *Forty-Eight Insulations,* 633 F.2d 1212 and *Porter v. American Optical Corp*, 641 F.2d 1128 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650. Furthermore, this court concludes that the liability limit of each individual carrier, based on the language of the policies (which according to the record contained very similar language to that of Travelers), was no less than that carrier's one year liability limit of $1,000.000.00. Travelers, individually, had an indemnity limit of no less than $1 million dollars, and all carriers combined had an indemnity limit of no less than $4 million dollars. Travelers, therefore, was responsible for a 48.57% of the $1.75 million dollar settlement, or $849,975.00, an amount which is also within its individual limits. Travelers underpaid its

share of the Gatlin settlement by $364,275.00. Union paid $291,450.00 of that difference. Zurich paid the remaining portion, but is not a party to this lawsuit

## CONCLUSION

The parties agree that there are no material facts at issue in this lawsuit and this court has so determined.  This court has considered each of the opposing motions in turn, viewing the evidence in the light most favorable to the non-movant in each instance.  Union's Motion for Summary Judgment is granted **[doc. no. 33].**  Judgment shall be entered for Union and against Travelers,[13] awarding Union the sum of $291,450.00, plus post judgment interest and costs. Traveler's summary judgment motion **[doc. no. 31]** is denied.

SO ORDERED AND ADJUDGED, this 29th day of September, 2018.

          s/ HENRY T. WINGATE        
          UNITED STATES DISTRICT JUDGE

---

[13] After oral argument, this court apparently was of the opinion that Travelers should prevail in this action and this court would issue an order stating as much; however, the court changed its mind during the writing of this opinion and the contemplation anew of telling authorities in the field.